# Spritzer *v.* Pennsylvania Railroad Company, Appellant.

*Negligence—Railroads—Personal injuries—Release—Evidence—Parol evidence to contradict writing—Province of court and jury.*

1. When in a common-law action the attempt is not to alter or contradict some of the terms of a written instrument, but to overcome it wholly and set it aside, the testimony of a single witness covering the point in controversy, no matter that it be contradicted by many opposing witnesses, requires a submission of the question of fact so raised to the jury.

2. In an action against a railroad company to recover damages for personal injuries where the defendant sets up a written release signed by the plaintiff shortly after the accident, the burden is on the plaintiff to show conditions which would avoid the release in law, and his testimony alone, although contradicted, requires a submission of the question of fact so raised to the jury; but where his own testimony shows that he executed the release without any fraud or misrepresentations on the part of the defendant's agents, and that his mental condition at the time was such that he was capable of comprehending and understanding his act and its nature with probable consequences, and there is no other evidence to show that at the time he signed the paper he was "not in condition to know what he was doing," the case should not be submitted to the jury.

3. Nothing short of evidence precise, clear and indubitable can be allowed to overcome a written instrument. When it does not come up to this measure the case should be withdrawn from the jury.

Argued Oct. 6, 1909. Appeal, No. 21, Oct. T., 1909, by defendant, from judgment of C. P. Somerset Co., Sept. T., 1906,

No. 239, on verdict for plaintiff in case of Henry Spritzer v. The Pennsylvania Railroad Company. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Reversed.

Trespass to recover damages for personal injuries. Before KOOSER, P. J.

The facts are stated in the opinion of the Supreme Court.

Verdict and judgment for plaintiff for $4,000. Defendant appealed.

*Error assigned* was in refusing binding instructions for defendant.

*H. W. Storey,* for appellant, cited: Van Voorhis v. Rea, 153 Pa. 19; Dickson v. Mfg. Co., 179 Pa. 343; Orwig's Est., 16 York, 149; Bierer's App., 92 Pa. 265; Walt v. Kulp, 9 Montg. 45.

*W. H. Ruppel,* with him *George B. Somerville,* for appellee, cited: Naglee's Est., 10 Pa. C. C. Rep. 525; Davidson v. Little, 22 Pa. 245; Arthurs v. Bridgewater Gas Co., 171 Pa. 532; McGill v. Rowand, 3 Pa. 451; Porter v. Hildebrand, 14 Pa. 129; New York Central, etc., R. R. Co. v. Fraloff, 100 U. S. 24; Albert v. Ziegler, 29 Pa. 50; Kidder v. Kidder, 33 Pa. 269; Brooks v. First Presby. Church, 128 Pa. 408; Bartholomew v. Kemmerer, 211 Pa. 277; Cromley v. R. R. Co., 211 Pa. 429; Kitler v. St. Ry. Co., 27 Pa. Superior Ct. 602; Moore v. Philadelphia Bank, 5 S. & R. 41; Com. v. Williams, 2 Ashmead, 69; Reisch v. Furst, 27 Pa. C. C. Rep. 40; Bleakley v. Adelman, 31 Pa. C. C. Rep. 159.

OPINION BY MR. JUSTICE STEWART, January 3, 1910:

In bar of the plaintiff's action, which was for the recovery of damages for personal injury and loss of personal property sustained in the wreck of a train of cars in which he was a passenger, the defendant pleaded a formal release executed and delivered by plaintiff before the bringing of the suit. The release was as follows:

"1905, May 11. For the amount and for the account stated in the following release: Know all men by these presents, That I, H. Spritzer, in consideration of the sum of Two Hundred Dollars (200) to me paid by the Pennsylvania Railroad Company, the receipt whereof is hereby acknowledged do hereby release and forever discharge the said company from all liability to me for or on account of all losses, damages, personal injuries and all losses which I have sustained on account of the accident which occurred to train 10 near Harrisburg May 11, 1905, on which I was a passenger, and by which I sustained personal injuries and losses. Witness my hand and seal the eleventh day of May, 1905.

"H. SPRITZER (SEAL)

"Witness present:

"SAMUEL W. IHLING.

"Received May 11, 1905, of the treasurer of the Pennsylvania Railroad Company Two Hundred Dollars in full of the above amount. $200."

The genuineness of the instrument was admitted; but it was sought to avoid it on the ground that at the time it was executed plaintiff was "not in condition to know what he was doing." So reads the plaintiff's replication. The case went to the jury on this and other issues, and resulted in a verdict for the plaintiff. The submission of the question as to the integrity and sufficiency of the release is made the subject of the first assignment of error. Was the evidence on this branch of the case sufficient to carry it to the jury? A careful review of the testimony has convinced us that it was not. Starting with the presumption in favor of the release, the burden was on the plaintiff to show conditions which would avoid it in law. This burden he undertook to discharge wholly and exclusively by his own testimony. Not another witness was called in his behalf who testified to a single fact or circumstance in connection with the giving the release, or to any fact or circumstance occurring within twelve hours thereafter, or to the plaintiff's condition at any time during this period, notwithstanding, according to his own testimony, the release was executed in a public place where he was surrounded by

many bystanders, and notwithstanding the further fact that within an hour or so thereafter unassisted he started on his journey home, distant more than 100 miles from the place of accident, in a passenger coach where so far as shown he was undistinguishable from the ordinary passenger. We remark upon this not as a circumstance to be considered in determining whether the question was one for the jury; for where in a common-law action the attempt is not to alter or contradict some of the terms of a written instrument, but to overcome it wholly and set it aside, the testimony of a single witness covering the point in controversy, no matter that it be contradicted by many opposing witnesses, requires a submission of the question of fact so raised to the jury: Gibson v. Western New York, etc., R. R. Co., 164 Pa. 142. We remark upon it simply to show the narrow limits within which our present investigation of the evidence is to be confined. The accident occurred between one and two o'clock on the morning of May 11, 1905, near the city of Harrisburg. The plaintiff testified that he was thrown from the car in which he was a passenger, by something like an explosion not otherwise described or accounted for; and that while lying some ten or fifteen feet from the track he was picked up by some persons and carried in an unconscious condition to the hospital where the injured had been assembled, and there placed upon a cot or stretcher. His examination in chief as to the occurrence proceeded in this wise: " Q. What became of you after they picked you up? A. I couldn't know what became of me. When I was in the hospital and opened my eyes, it was about three or four o'clock. I saw a whole lot of people, maybe 100 people lying on the floor, some on stretchers and on benches and all kinds of shutters and on the floor, ladies and children and gentlemen. Q. In the hospital? A. In the hospital, in the front room of the hospital. Q. What then occurred to you when you found yourself lying on the stretcher on the floor of the hospital? A. When I opened my eyes in the hospital—I believe I was in the hospital in a kind of a stupor for an hour or two, and I don't know how long I lay on that stretcher on the floor. It was dark, about one o'clock.

When I opened my eyes in the hospital it was about three or four o'clock. Q. That morning? A. Yes, sir, the same morning that the wreck was, and I began to feel a very terrible pain in my shoulder and was very cold because I was naked; my underclothes was in pieces. Q. What clothes had you on? A. I had on just an undershirt and a pair of trousers, and they were torn in pieces. Q. Then what happened to you? A. Some of the people from the hospital, I couldn't know who they were came to me. Q. What did you do? A. I laid on that stretcher on the floor until a man came and asked me, told me to wait a little while, they were too busy with the ladies and children. All the wards were full of people. He said they would take me to a bed, they would take other rooms in the neighborhood, as the hospital rooms were all full. Q. What did you say then, or what did you do? A. I said, 'No, I couldn't do it.' I told him they shall give me clothes and a ticket, that I was willing to go home, before I am dead. Q. Now, Mr. Spritzer, what did you do then? A. That man said, 'Wait a minute.' They called another man to me, I believe, and the other man said 'Where do you live?' I told him at Windber. He said 'Do you want to go home?' and I said 'Yes, I want to go home; I wouldn't scare my family. I want to get home when I can.' He said, 'All right, I will fix you up.' In a few minutes that man and another man came with a pile of secondhand clothing in his hand, and some receipt book, some paper, something like a receipt book. He said 'Write your name here and I will fix you up and you can go home. I will give you the clothes.' And two of them people took me, one held me by the hand and the other dressed me, gave me about 44 coat, a very big one; my size is a 34. They gave me a big straw hat, and a pair of shoes, but no stockings, some of them fellows took me outside and put me in a buggy, and they brought me, I suppose, to the Pennsylvania Railroad station, and they sat me in the car, and they sat down with me in the car." We have here thus given all that was testified to by the plaintiff in his examination in chief touching his condition and the giving of the release. Something more was developed on his cross-examination. It pro-

ceeded: "Q. You say some person came to you while you were in the hospital with a paper? A. Yes, he had a paper in his hand. Q. That was about the time that you awoke, about daybreak? A. About three or four o'clock. Q. Will you look at that paper and say if you recognize it (release shown witness)? A. I said before that a man came in the hospital with a piece of paper, and said——Q. Look at that paper and say if you recognize that paper. Did you ever see it before? A. I say the name is mine. . Q. Are both those names yours? A. Yes, sir. Q. Henry, when you signed that paper, did the gentleman give you anything? A. What gentleman? Q. The gentleman who handed you the paper which you say you signed. A. Yes, sir. Q. What did he give you? A. A check (check handed witness). Q. Will you look at that check and say if you ever saw it before? A. I was sick and didn't look at it. I couldn't recognize it. Q. Did you ever see that check before? A. He handed me a check when I was sick, and some of the people put it in my pocket. Q. Is that the check? A. I can't recognize that check. Q. You don't recognize it? A. You ask me about that check? Q. Yes, I am asking you about this particular check. How much was the check for that you got? A. After I found it I saw it was $200. Q. When this man handed you the paper how much did you tell him your losses were? A. He didn't ask me about the losses, I told him that I had money. Q. How much did you tell this gentleman that you had lost by reason of this accident? A. He didn't ask me how much, I told him I had pretty near $200 in cash, and I couldn't buy a ticket because I had lost it." We have omitted nothing from the testimony of the witness which has even remote bearing on the question before us.

The least that can be required of one who attempts by his own uncorroborated testimony, to escape from the binding force of a written agreement, which he admittedly executed, on the ground that at the time of its execution he did not understand the nature and character of the act in which he was engaged, is a direct, positive and unequivocal statement from him that such was his attitude and condition of mind. If he was so far mentally incompetent that he is without recollec-

tion of the transaction, he can say so; if affected to a degree which leaves his memory of the transaction obscure and uncertain, he can say so; if surrounding conditions at the time he executed the paper were such as to preclude sensible and deliberate action, or make him the easy subject of fraud and imposition, and these were practiced upon him by misrepresentation or concealment, he is free to state all the facts in connection therewith. Where a party under such circumstances asserts nothing distinctly with reference to his mental condition at the time inquired of, testifies to nothing from which the degree of mental impairment, if any, can be discovered with even reasonable certainty, or nothing warranting an inference that his condition, whatever it was, was employed to extract from him an unconscionable bargain, and the case rests on his testimony alone, he has no right to an issue before a jury on the question of whether his contract is to be enforced against him or set aside. Was this plaintiff when he executed the release in question capable of comprehending and understanding his act, its nature and probable consequences? He nowhere says he was not; he nowhere says he did not understand it; he does not say that he did not read the release, or that it was not read to him, or that its contents or effect were misrepresented to him. If this failure to testify directly as to these considerations on which his right to be relieved from his contract depended, be overlooked, and his testimony be examined for facts from which his inability to comprehend the nature of the transaction might reasonably be inferred, failure here is quite as obvious. His testimony covered the particulars of his surroundings at the time, and occurrences in connection with the execution of the release, in a way that negatives the claim set up that he was without intelligent understanding. He was so far in possession of his faculties that he remembers and can recall with positive asseveration what did and what did not occur in respect to himself, who were present and who were not, what he said and what he did not say during the period to which this inquiry must relate. True, he says that he was carried from the place where he was found along the track to the hospital, and there placed upon a cot where he believes he

remained "in a kind of a stupor for an hour or two," from which, however, he had recovered before anything was said or done about the release. What his injuries were which produced this stupor he nowhere states. So far as could be observed he was without any, except some contusions which his own home physician testified did not injure him to any serious extent. The extent of his injuries and suffering during the period he was at the hospital appears from the following answer given by him in his examination in chief: "Yes, sir, the same morning that the wreck was, and I began to feel a very terrible pain in my shoulder and was very cold, because I was naked, my underclothes was in pieces." And this is all of his testimony with respect to his suffering. With what developed later we have no concern. It is of course possible that under such conditions as he described he may have lacked the power of free, intelligent action; but mere possibility will not sustain a legitimate inference of the existence of facts. The plaintiff's case presented nothing better.

There is nothing left in the case except the amount paid on the release, and the circumstance that the release was given within a few hours after the accident occurred. Neither could be for consideration except in connection with something shown in the case, which being so supplemented afforded a basis for a reasonable inference that the plaintiff did not have intelligent understanding of the transaction. If the plaintiff was himself and understood what he was doing, the time when the release was executed is unimportant, and so, too, the consideration paid. In themselves these features of the case are of the slightest significance. The presumption in favor of the integrity of an instrument of this kind is not lightly overcome. Nothing short of evidence precise, clear and indubitable can be allowed to overturn a written instrument. When it does not come up to this measure, the case should be withdrawn from the jury: Penna. R. R. Co. v. Shay, 82 Pa. 198; Gibson v. R. R. Co., 164 Pa. 142; DeDouglas v. Traction Co., 198 Pa. 430. And that is clearly what should have been done in this case, assuming the testimony of plaintiff to be true, and giving no significance to the fact that it was contradicted with re-

spect to everything material or important, even to the circumstance of his having occupied a cot in the hospital, by a number of disinterested witnesses. The first assignment of error is sustained; the judgment reversed, and judgment is now entered for defendant.