Aliquippa National Bank, to use, *v.* Harvey,
Exrx., Appellant.

Argued October 28, 1940. Before Schaffer, C. J., Maxey, Drew, Linn, Stern and Patterson, JJ.

*Geo. H. McWherter,* with him *Vincent R. Smith* and *Lawrence M. Sebring,* for appellant.

*H. E. Craig,* of *Craig & Rowley,* for appellee.

Opinion by Mr. Justice Stern, November 25, 1940:

When properly culled from the voluminous testimony in this case the facts reduce themselves to two controlling issues, one concerning itself with the extent of the inherent powers of the cashier and president of a bank, the other with the sufficiency of the evidence of fraud to invalidate a written instrument.

Defendant, Edward Harvey,[1] who was the owner of a theatre property in Aliquippa, in 1928 executed a long-term lease thereof to Anthony Jim with an agreement to sell the theatre to him upon the payment of certain installments. There was a mortgage on the property held by Peoples Pittsburgh Trust Company, and in 1930 defendant desired to obtain a larger loan

---

[1] Harvey died during the litigation, and his widow, executrix of his will, was substituted as defendant.

from that company.  At that time plaintiff, Aliquippa National Bank, held a judgment against Jim, originally in the amount of $12,300 but then reduced by payments, and, as this constituted a lien against his equitable interest in the property, Peoples Pittsburgh Trust Company, as a condition of making the loan, insisted that the bank should postpone its judgment to the new mortgage to be created.  The bank, in turn, was unwilling to do this unless defendant would give it, as security for the payment of Jim's debt, his own note in the sum of $10,500.  Accordingly defendant executed and delivered to the bank his judgment note in that amount dated February 19, 1930, and the mortgage transaction was thereupon consummated as planned.

Shortly thereafter Jim sublet the theatre and gave an option for its purchase to Samuel Hyman and H. Rosenthal, who went into possession and operated it. In 1931 Jim became financially embarrassed and defaulted in his obligations under the lease.  Defendant, by amicable action of ejectment, ousted Jim, negotiated with the sublessees, and entered into an agreement to sell them the property, payment to be in installments over a course of years, they meanwhile to continue in possession.  Before executing this agreement, however, he required that Hyman and Rosenthal should assume Jim's obligation to the bank.  On July 31, 1931, after a conference with its cashier, Hyman and Rosenthal gave the bank a note for $10,800 made to their order by Aliquippa Amusement Company and endorsed by them. Aliquippa Amusement Company was a corporation which had been organized by them to operate the theatre.

In October, 1931, the bank, being in failing condition, transferred its assets to Woodlawn Trust Company, under an arrangement by which the latter guaranteed its deposits.  On November 21, 1931, Woodlawn Trust Company, as use-plaintiff, entered judgment against defendant for $10,500 on his note of February 19, 1930. In 1936 he signed an amicable agreement to revive this

judgment, but in August, 1938, filed a petition to open the revived judgment on the ground that the note given to the bank by Hyman and Rosenthal constituted a payment of the Jim indebtedness and thereby worked a release of his own liability, since his note had been given only as collateral security for the note of Jim. A rule to show cause why the judgment should not be opened was granted and subsequently made absolute, and the controversy was then presented to a jury for determination. A verdict was rendered for defendant, but the court entered judgment for plaintiff n. o. v. Defendant now appeals from that action of the court.

The trial concerned itself with the question whether the Hyman and Rosenthal note was taken by the bank as additional collateral security for the Jim debt or as payment thereof. Presumably, if the holder of a note accepts a new note, either of the debtor or of someone else, this does not constitute an extinguishment or liquidation of the original instrument. Unless there is proof of a special agreement to the contrary, the assumption is that the precedent debt remains in effect, the new obligation being accepted only by way of collateral security or conditional payment: *McCartney v. Kipp*, 171 Pa. 644, 33 A. 233; *Second National Bank of Mechanicsburg v. Graham*, 246 Pa. 256, 92 A. 198; *Citizens' Bank of Wind Gap v. Lipschitz*, 296 Pa. 291, 145 A. 831; *Lincoln Deposit & Trust Co. v. Sanker*, 305 Pa. 576, 158 A. 255; *Harr v. Fairmount Foundry, Inc.*, 331 Pa. 59, 200 A. 46. To establish such an agreement defendant testified that Frank Long, the cashier of the bank, told him he would accept a note of Hyman and Rosenthal in payment of the Jim note, and, accordingly, defendant took them over to the bank to make such an arrangement and left them there for that purpose. After his departure Hyman and Rosenthal had an interview with Long; Coombs, the president of the bank, may also have been present at the conference, but this is not certain. Hyman testified in effect, although not at all clearly, that

it was understood they were "taking over" Jim's note; they agreed to "pay this [Jim's] note off and Anthony Jim's note was supposed to be returned to us." Long left Aliquippa in 1933, and his version of the interview was therefore not available at the trial. Notwithstanding the unlikelihood of the bank's willingness to accept the note of the new tenants of the theatre as absolute payment of the Jim note, with a consequent release of the obligation of defendant, the owner of the theatre property, the jury chose to believe such to be the fact. Assuming it, therefore, to be true, as for present purposes we must, the question arises whether either the cashier or the president could bind the bank by such an arrangement.

The transaction as alleged may be regarded in one of two ways,—either as the payment of the Jim note by something other than money, to wit, the note of another party, or as the making of a new loan to Hyman and Rosenthal and their application of the money borrowed to the payment of the Jim note. In either aspect it was beyond the authority of the bank officials who consummated it. No evidence was presented at the trial as to the powers given them by the by-laws, or whether and to what extent they were entrusted with the management of the business of the bank or were held out as having such authority. As to the powers implicit in their offices, there is general authority to the effect that neither the president nor the cashier has the right to accept anything but money in payment of an obligation due the bank, nor the power to make loans or to discount paper, without being authorized by the board of directors either expressly or by long-continued acquiescence. We are not called upon, however, in the present case to determine whether such officials have authority by virtue of their inherent powers to grant at least routine loans in the ordinary course of business,—for example, on marketable collateral or in moderate amounts. This transaction was not in any such category. The

records of the bank show that transactions of the magnitude of $10,000 were not common in its business. Hyman and Rosenthal were engaged in the admittedly speculative business of operating a motion picture theatre, and one in the conduct of which their predecessor had lamentably failed. Their note, according to defendant's version, was to be accepted without security of any kind, and the obligation of the owner of the property, whose note had been held by the bank as collateral, was to be released. Certainly, such a transaction was not one which could be entered into on behalf of the bank without authority of the board of directors conferred either expressly[2] or by implication from the manner in which the business of the bank had been customarily transacted, and as to this, as already stated, there was no testimony. As illustrative cases in our own State supporting this conclusion may be cited: *Mutual Trust Co. v. Stern*, 235 Pa. 202, 83 A. 614; *First National Bank of Greencastle v. Baer*, 277 Pa. 184, 120 A. 815; *First National Bank of Hooversville v. Sagerson*, 283 Pa. 406, 129 A. 333; *Lehigh Valley National Bank v. Rapp*, 286 Pa. 29, 132 A. 716; *Brown v. Mt. Holly National Bank*, 288 Pa. 478, 136 A. 773; *Warren Savings Bank & Trust Company v. Foley*, 294 Pa. 176, 144 A. 84; *Citizens' Bank of Wind Gap v. Lipschitz*, 296 Pa. 291, 145 A. 831. See also *Bank of The United States v. Dunn*, 31 U. S. 51, 59; *United States v. City Bank of Columbus*, 62 U. S. 356, 364; *Farmers & Merchants Bank v. Bayer*, 259 Ill. App. 31.

The day following the execution and delivery to plaintiff bank of the Hyman and Rosenthal note, defendant,

---

[2] It appears from the minutes of the board of directors that on August 5, 1931, they approved in bulk a large number of loans previously approved by the discount committee, and the Hyman and Rosenthal note was included in this lot, but there is nothing to indicate that they approved that note as evidencing a new, independent loan and as a payment of the Jim indebtedness and a release of defendant's note as collateral.

according to his testimony, called on Long, the cashier, and asked him for the return of his note, and Long promised to give it to him but never did so. After the failure of the bank and the transfer of its assets to the use-plaintiff, Woodlawn Trust Company, defendant met the latter's counsel and told him that the Jim note had been paid and that his own note had been held by plaintiff bank as collateral security and he "wanted it back," but instead of complying with this request the Trust Company entered judgment thereon. Notwithstanding defendant's alleged insistence that his note had been released by the bank's acceptance of the Hyman and Rosenthal note in payment of the Jim debt, he executed, under seal, on November 23, 1931, and delivered to the Trust Company, a paper in which he "covenanted and agreed" that his judgment note, which, two days before, had been entered of record, should be "considered as additional collateral for the payment of" the indebtedness represented by the judgments against Jim and the Aliquippa Amusement Company, and that "for aforesaid purpose he has no defense thereto." On July 14, 1936, he signed an amicable agreement for the revival of the judgment against him. On December 29, 1937, he entered into a written agreement, under seal, with the Trust Company, in which, after a recital of the indebtedness of Hyman and Rosenthal and the Aliquippa Amusement Company on the judgments entered against them on their note of July 31, 1931, defendant expressly admitted his obligation to the Trust Company for this same indebtedness as evidenced by the revived judgment against him, and stated that he had requested the Trust Company to proceed against Hyman, Rosenthal and the Amusement Company for the recovery of the debt, that it had brought such proceedings, and that Hyman had offered to pay it the sum of $3,250 on condition of receiving a release from the Trust Company and defendant from all further liability; therefore defendant authorized and directed the Trust Company to

accept the proffered settlement and to release Hyman, such action in no way to affect defendant's liability for the balance of the indebtedness, and he expressly agreed to pay such balance. The agreement stated that it was made for a valuable consideration "and the parties hereto intend to be legally bound hereby."

It must be immediately evident that, if this agreement was valid and enforceable, defendant's case wholly collapses. The Trust Company had been insisting upon his liability on the judgment against him, while he, on the other hand, had taken the position that, first with him and afterwards with Hyman and Rosenthal, plaintiff bank, through its cashier Long, had agreed to a transaction which extinguished that liability. Now, by a final settlement of the controversy, he admitted his liability on the judgment and agreed to liquidate it. There can be no question of consideration to support the agreement, for not only was it under seal *(Land Title Bank & Trust Co. v. Freas,* 334 Pa. 26, 5 A. 2d 165) and not only did it contain an express statement that defendant intended to be legally bound thereby (Act of May 13, 1927, P. L. 985, section 1), but the Trust Company, acting in pursuance of the authority given, accepted the $3,250 from Hyman and released him from all further liability.

In order to avoid the devastating effect of this agreement upon his present contention, defendant claims that it was obtained by fraud, and this raises the second issue involved in the present appeal. In the negotiations leading up to the making of the agreement and in the approval of its terms defendant was represented by competent counsel. But the fraud, as asserted by him, consisted of the alleged fact that counsel for the Trust Company told him at various times that according to the records of plaintiff bank he continued liable on his note, and it was because of his reliance on those statements that he came to admit his liability and executed the declaration of no defense, the amicable revival of

the judgment, and the agreement of December 29, 1937. After defendant, on August 30, 1938, obtained the rule to open the judgment against him he had an examination made of the books of plaintiff bank and found, they did not show that he remained liable on his note; on the contrary, the record of the Jim note, under instructions from Long, contained the notation "paid" under date of July 31, 1931. As far as such notation is concerned, this was of no vital significance because, as was shown by the testimony, there were instances of other classes of transactions,—for example, where renewal notes were accepted,—in which it was common practice for the bank to stamp notes as paid, or to mark them on the books as paid, when in reality there was no actual payment and the liability of the debtor thereon admittedly continued. It is generally held that, when notes are endorsed with notations of receipts of money, or the word "payment" is used, such markings are open to explanation and need not be construed as importing an actual liquidation of the obligation: *Greenawalt v. McDowell*, 65 Pa. 464; *Ellis v. Sokoloff*, 298 Pa. 535, 148 A. 707; *LeRoy's Estate*, 305 Pa. 541, 544, 545, 157 A. 800, 801.

The principal question is whether the testimony of defendant in regard to the alleged misrepresentations made to him and his reliance thereon was of sufficient weight to permit a jury to find that the agreement of December 29, 1937, was not binding upon him. To set aside an instrument, especially one executed, as was this, with the approval of counsel, something more is required than uncertain and doubtful evidence of fraud. "It has been more than once held that it is error to submit a question of fraud to the jury upon slight parol evidence to overturn a written instrument. The evidence of fraud must be clear, precise and indubitable; otherwise it should be withdrawn from the jury": *Pennsylvania R. R. Co. v. Shay*, 82 Pa. 198, 203. "Whether the evidence is true is a question of fact . . . but whether

it meets the required standard which justifies its submission to the jury . . . is always a question of law; and as we have seen from numerous authorities here cited, some of the qualities required of evidence, to set aside a written instrument on the ground of fraud in its procurement, are that witnesses depended upon for that purpose shall 'distinctly remember the facts to which they testify' and 'narrate the details exactly' ": *Ralston v. Philadelphia Rapid Transit Co.*, 267 Pa. 257, 269, 110 A. 329, 333. "It may be conceded at once that it is necessary for this [that the evidence be clear, precise and indubitable] to be true before reformation can properly be granted. . . . Whether the evidence meets this standard is, in an action of law, a question for the trial judge, and his ruling is open to review here. . . . The phrase has a technical legal meaning. That meaning is that the witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue": *Broida v. Travelers Insurance Co.*, 316 Pa. 444, 447, 448, 175 A. 492, 494. See also *DeDouglas v. Union Traction Co.*, 198 Pa. 430, 48 A. 262; *Spritzer v. Pennsylvania R. R. Co.*, 226 Pa. 166, 173, 75 A. 256, 259; *Leonard v. Coleman*, 273 Pa. 62, 116 A. 550; *Miller's Estate*, 279 Pa. 30, 38, 123 A. 646, 649; *Horsey v. Ciaroro*, 280 Pa. 513, 124 A. 677; *Keys v. Hanscom Brothers, Inc.*, 288 Pa. 389, 135 A. 860; *Vogel v. Taub*, 316 Pa. 41, 173 A. 270; *Foley v. Wasserman*, 319 Pa. 420, 179 A. 595; *Berardini v. Kay*, 326 Pa. 481, 486-488, 192 A. 882, 884, 885; *Doneyho v. Scottdale Connecting R. R. Co.*, 330 Pa. 207, 199 A. 162.

Defendant's testimony in regard to the alleged misrepresentations is neither "clear" nor "precise", and, so far from being "indubitable," it is scarcely credible. He did not show that he "distinctly remembered the facts,"

nor did he "narrate the details exactly." He stated in general terms that counsel for the Trust Company told him "dozens of times" that the records of the bank indicated he was still liable on his obligation, but the details of the conversations, and just when and where they occurred, were not disclosed. Of greater significance is the fact that, instead of relying upon such alleged statements, (denied by counsel for the Trust Company), his actions are proof to the contrary. He himself testified, although not consistently throughout, that notwithstanding these misrepresentations he had frequent meetings with the treasurer of the Trust Company and always insisted to him that he had been discharged from liability. Moreover, if, as he testified, Long promised him to accept the Hyman and Rosenthal note in payment of the Jim indebtedness, and, as Hyman testified, Long did so, and, as defendant further testified, Long, on the following day, promised to give him back his note, it is scarcely conceivable that he should nevertheless have executed documents admitting his liability and agreeing to pay this substantial sum of money merely because counsel for the Trust Company told him that according to the books of the bank he had not been released. Indeed, that it was not these alleged misrepresentations which led him to believe he was liable is conclusively established by the fact that, when he originally asked for the opening of the judgment and alleged in his petition that the Hyman and Rosenthal note had paid the Jim note and therefore he was not liable for the debt, he had not yet seen the books of the bank, for it was only later, when depositions were taken under the rule, that he examined those books for the first time. In his petition he made no allegation of fraud, but, on the contrary, in order to excuse his having executed the declaration of no defense, he asserted that, when he signed that document, "he was not aware of the contents of same." On the whole, as the court below concluded, his testimony fell far short of the standard re-

quired to overthrow a written instrument solemnly executed. No deed, release or other legal document could be relied upon if the law were to permit its invalidation by a jury on testimony as unconvincing as that here presented.

For the twofold reason, then, (1) that the alleged transaction of the bank officials in accepting the Hyman and Rosenthal note in payment of the Jim note was not binding upon the bank in the absence of any evidence as to their authority for so doing, and (2) that the agreement of December 29, 1937, in which defendant admitted his liability on the judgment against him and agreed to liquidate it, was not impeached by the testimony which defendant offered for that purpose, the judgment which the court below entered for plaintiff n. o. v. is affirmed.