## Bernatovich et ux. *v.* Davis, Appellant.

Argued April 14, 1941. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*J. Julius Levy,* with him *John W. Lord, Jr.,* Special Deputy Attorney General, *Orville Brown,* Deputy Attorney General, and *Claude T. Reno,* Attorney General, for appellant.

*David Landau,* for appellees.

OPINION BY MR. CHIEF JUSTICE SCHAFFER, May 12, 1941:

Plaintiffs, husband and wife, tenants by entireties of a property on which they had created a mortgage for $5,000 in favor of the Bosak State Bank, filed a bill in equity, after the bank's failure, against its receiver, praying for a decree declaring the mortgage paid, forbidding foreclosure proceedings upon it, and compelling the entry of satisfaction on the record. The chancellor so ordered. From this action the receiver appeals.

The bill recites that, at the time the mortgage was made, June 10, 1926, no money was paid by the bank

to plaintiffs, but it was given as collateral to secure repayment to the bank of amounts which the husband, a building contractor, desired to borrow, in order to perform a construction contract. During succeeding months, the husband, in consideration of the mortgage, received various loans and made various payments thereon. It is alleged that on November 26, 1926, plaintiffs conferred with Edward Bosak, vice-president of the bank, concerning the payment of their debt and the satisfaction of their mortgage, and were informed by him that all loans advanced upon the security of the mortgage had been paid, except the sum of $3,000, and thereupon the husband gave a check to the bank for that amount in full payment and satisfaction of all money due for or on account of the mortgage, and Bosak as vice-president of the bank orally promised and agreed to accept the check as such payment and satisfaction, and that the mortgage would be marked satisfied of record. It was further alleged that by reason of the payment of the sum named there remained no liability to the bank upon the mortgage, and plaintiffs did not learn that it had not been satisfied in accordance with the alleged agreement until after the bank was closed and demand for payment was made by the receiver. It should be noted that nothing is said in the bill about a note for $2,000, executed by the husband-plaintiff, which was given to the bank simultaneously with the check for $3,000.

At the trial, the wife-plaintiff testified that, on November 26, 1926, she and her husband saw the vice-president at the bank, who said to her that if the bank was paid $3,000, the mortgage would be satisfied, and that her husband thereupon wrote a check for that amount and delivered it to the vice-president.

The husband testified that he gave the mortgage as collateral for future loans and thereafter borrowed from the bank from time to time. The mortgage recites that it is given as additional or collateral security for the

payment of any note or notes now or thereafter made to the bank by the mortgagors or either of them. Recounting what took place between plaintiffs and the vice-president of the bank, the husband said the latter told him if he would pay $3,000, everything would be all right and he would have the mortgage satisfied; that with this understanding he drew a check for $3,000 to the bank and handed it to the vice-president. After this time he paid premiums on the policy of fire insurance on the property, which contained a mortgagee clause, and also paid such premiums after the bank had become insolvent. It is undisputed that, subsequent to the execution of the mortgage, and prior to November 26, 1926, when the conversation relative to its satisfaction is alleged to have taken place, the husband-plaintiff borrowed the sum of $5,500 from the bank, whose books show that amount to be owing on the latter date. This indebtedness was evidenced by a note dated October 21, 1926, for $2,000; one dated November 18, 1926, for $3,000, and a third dated November 22, 1926, for $500. With the payment of $3,000 on November 26th, this left an indebtedness to the bank on that day of $2,500. Thus, while it was argued in plaintiffs' behalf that the note for $2,000, given on November 26th, together with the $3,000 check, was in complete discharge of his existing obligation to the bank, it is obvious that this could not be true, for the undisputed book entries show that his indebtedness exceeded these combined sums at that time, and the note teller testified that the new note was merely a renewal of a prior note for $2,000.

On November 8, 1929, the husband-plaintiff executed another note covering his then indebtedness to the bank of $32,020, in which he stated that he had deposited as collateral security the bond and mortgage in question. At the time the bank closed its doors, he owed it $46,099.27.

The vice-president of the bank testified, not only that he entered into no agreement or undertaking with the plaintiffs to satisfy the mortgage, but that he had no conversation with them on that subject, and had never seen the wife-plaintiff. Furthermore, he said that he had no power to agree to satisfy the mortgage upon the payment of $3,000, and that he could not have entered into an agreement to satisfy it unless the bank was fully secured for the loans it had made, which it then was not.

The court below found as a fact: "That in consideration of the payment of $3,000 to the Bosak Bank November 26, 1926, in addition to a new note for $2,000 shown on the records as having been given that date, Edward Bosak, its vice-president, agreed that said mortgage of June 10, 1926, was thereby paid and he promised to satisfy the same of record." It was also found as a fact: "That Edward Bosak as vice-president of the said Bosak Bank was duly empowered, and had authority to bind said bank by his promise to satisfy the mortgage, and by his acceptance of check for $3,000." We think neither of these findings was warranted by the evidence.

It is argued in appellee's behalf that the finding of the chancellor that the vice-president had authority to agree to satisfy the mortgage should be sustained, because the records of the bank on the day in question show a credit of $5,000, the principal amount named in the mortgage. But as analyzed by the note-teller of the bank, called as a witness to explain the entries, and, as is manifest to us, they do not show such a credit. They show a cash payment of $3,000 on existing notes and the renewal of a note for $2,000.

It is further argued that the finding should be sustained, because the vice-president and note teller of the bank both testified that they had such authority. A reading of the testimony of the vice-president shows that he did not make the broad statement that he had

general authority to satisfy, or to agree to satisfy, mortgages for a sum less than the full amount. Indeed, under the circumstances here appearing, he said he had not. Asked whether "Assuming that a person wanted to have a mortgage satisfied and also had other collateral deposited with you, you could have said, 'I will take so much and satisfy your mortgage and retain the other collateral,' " he answered, "Provided the other loans were sufficient security. The mortgage could not be satisfied until the bank was amply secured." He specifically said, in answer to the query, whether if plaintiffs owed more than $3,000, he, as an officer of the bank, could agree to satisfy the mortgage, that he certainly could not. The note-teller testified that the only authority which he had to surrender collateral was upon full payment of the debt, or payment of the full value of the collateral.

As to the additional argument, that the chancellor's finding of authority in the vice-president to agree to satisfy, is supported by evidence of an established custom so to do, we are compelled to say that there is no such evidence in the record. The fact is that there is no proof at all of such authority, express, implied or apparent, in the vice-president. Even if plaintiff's version of the transaction were correct, and the vice-president accepted the $3,000 and the note of the husband-plaintiff in lieu of the mortgage, this would have been a surrender of valuable collateral security, representing the joint obligation of plaintiffs and constituting a lien on property which they held by the entireties, in exchange for a smaller sum of money and an unsecured note of the husband-plaintiff alone. To the extent that the bank did not receive cash for the full amount of the mortgage, its security was altered and impaired.

It cannot be assumed that the vice-president possessed inherent power to release the mortgage by virtue of his office. The mere fact that he acted as executive officer of the bank could not establish such authority, and

there was no evidence that the directors had, by acquiescence or otherwise, clothed him with the appearance of such authority. It is the general and well-settled rule that a bank officer has no power to consent to any arrangement which will impair the security or collateral of the bank: 4 Zollman, Banks and Banking (Perm. Ed.) Sec. 2229. This rule applies with equal force to all of the executive officers, president, vice-president, and cashier. See *Warren Savings Bank & Trust Co. v. Foley*, 294 Pa. 176, 144 A. 84. Thus in *Aliquippa Nat'l Bank v. Harvey*, 340 Pa. 223, 16 A. 2d 409, we held that the president of a bank had no authority to accept the note of lessees of a theatre in satisfaction of a note given by the owner. Speaking through Mr. Justice STERN, we said (p. 228) : "Their note, according to defendant's version, was to be accepted without security of any kind, and the obligation of the owner of the property, whose note had been held by the bank as collateral, was to be released. Certainly, such a transaction was not one which could be entered into on behalf of the bank without authority of the board of directors conferred either expressly or by implication from the manner in which the business of the bank had been customarily transacted, and as to this, as already stated, there was no testimony." And see *First Nat'l Bank of Hooversville v. Sagerson*, 283 Pa. 406, 129 A. 333; *Bank of Pennsylvania v. Reed*, 1 W. & S. 101; Magee, Banks and Banking (3d ed.) Secs. 121, 146. Plaintiffs, consequently, were bound to know this common limitation upon the officer's authority: *Brown v. Mt. Holly Nat'l Bank*, 288 Pa. 478, 136 A. 773.

When, in addition to the foregoing, account is taken of the fact that on November 26, 1926, and at all times thereafter, Bernatovich was indebted to the bank, and that he allowed the mortgage and accompanying bond to remain in its possession until the institution's failure, we see no escape from the conclusion that the court below was in error in decreeing that this obligation had

been paid, and in enjoining proceedings thereon and ordering satisfaction of the mortgage.

The decree is reversed and the bill dismissed at the cost of appellant.