Garrett, Appellant, *v.* Moore-McCormack Company, Inc., et al.

70

Argued November 24, 1941. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Abraham E. Freedman,* of *Freedman & Goldstein,* for appellant.

*Rowland C. Evans, Jr.,* with him *Springer H. Moore, Jr.,* and *Krusen, Evans & Shaw,* for appellee.

OPINION BY MR. JUSTICE LINN, January 5, 1942:

Plaintiff, a seaman, sued on two causes of action: (1) pursuant to Section 33 of the Jones Act,[1] 41 Stat. 1007, 46 U. S. C. A. section 688, for damages for negligence; and (2) for maintenance and cure under the admiralty law. He declared for $100,000. The defense was that plaintiff had released his claims. The jury rendered a verdict, "$1,000 for maintenance, and $3,000 for pain, injury and wages." Defendants moved for judgment n. o. v. and their motion was granted on the ground that the evidence was insufficient to support a finding that plaintiff's release was invalid. Plaintiff appealed.

Plaintiff was employed as a deck maintenance man on board the S/S MINNEQUA at $50 per month, etc., for a voyage to Baltic ports and return. The voyage began January 10, 1937, and ended March 5, 1937. He claimed for various injuries but particularly for serious injury to his back, a fracture of the lower transverse spinal processes, which he alleged resulted from the fall on him of a defectively fastened ventilator cover. We accept his statement, because corroborated by one of respondent's witnesses, that the accident occurred the day before the vessel reached its first port, Gothenburg, and that he received first aid and went to bed. During the six-hour period the vessel remained in that port, plaintiff remained on board. The next port, Copenhagen, was reached a day or so later and there plaintiff went ashore

---

[1] "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employes shall apply; . . . ."

Section 1 of the Federal Employers' Liability Act provides: "Every common carrier, by railroad while engaging in [interstate] commerce . . . , shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employes of such carrier . . . ." [35 Stat. 65, 45 USCA section 51].

and, at the captain's request, was examined by respondent's doctor, who gave plaintiff a written report, identified by him and in evidence, stating that he had contusions of the first and second fingers of the left hand, no fracture; "The contusion of the right foot is not much. It will be best in treating the fingers that the man don't work for three days with the hand." He remained on shore some time. He testified that he went to a place where he had "some drinks" and that he returned to the ship with a note from the proprietress of a restaurant asking that the captain put him in funds to pay her bill of 30 kroners. The captain testified that, before landing at Copenhagen, he had noticed that plaintiff's hand was painted with iodine and that he instructed him to go to the company's doctor and report back. The captain also testified that on the evening of plaintiff's return to the ship when he brought to him the note requesting the payment of money for the restaurant keeper, plaintiff "was bleeding from the mouth, and his jaw was swollen." These were injuries the captain had not observed in the morning and the doctor had not found on his examination; obviously they were inflicted on shore. The captain said he declined to give plaintiff the amount because it was more than was owing to him. The ship sailed from Copenhagen the next morning, January 29th, and arrived at Gdynia, Poland, on the morning of the 30th, when plaintiff informed the captain that he thought his jaw was broken; the captain then directed that he be taken to a hospital. At the hospital he was X-rayed and put to bed. He testified that plaster casts were applied to his head and leg and he was put "on fracture boards" for his back. The plaster casts which he says were applied to his head were, we assume, required by the condition of his jaw described by the captain. The ship returned without plaintiff. Subsequently, respondents arranged for his discharge from the hospital and his return on another of their vessels. When the vessel on which he returned arrived at Jersey City, March 18, 1937, he went

to the company's office and reported to respondents' agent at the latter's request. Plaintiff testified he said to the agent, "I would like to get what money I have coming to me and go to a hospital. I'm very sick." The agent sent him to the Marine Hospital where X-rays were again taken. At that time the agent paid him $15 because he said he had no money; the next day he received $10, and the day after, $3; for each payment he signed a simple receipt. He testified that he thought he had three months' wages due him though he must have been mistaken about that because, by an itemized voucher in the record, he had acknowledged the receipt at Gdynia of his wages in full to February 8th. The voyage for which he engaged ended March 5th. During the trial he denied that he had made any claim to the agent for injury, asking only for wages. Respondents' evidence is that he also claimed for injury and was told that the only injury that they believed he had sustained on board was the trivial injury to the fingers reported by the Copenhagen doctor.

On March 24, 1937, in the respondents' office, he signed a formal release of all claims; he read the release which was witnessed by two subscribing witnesses and bears a notary's certificate of acknowledgment. Respondents had offered to settle all claims for $100, less the $28 which they had advanced to him, as has been stated, on and after March 18th. He testified that the company's agent said to him, "If you don't sign here and take your money and go to Chicago, I'm going to have you put in jail." He said he had been drinking and had been taking "vernal [veronal?] pills." Asked at the trial how he was "feeling at that time," he replied, "I was sick. I said, 'Give me the money' and he wrote it out and said, 'You take this over to 5 Broadway.'" The agent who took his release did not pay him but gave him the release and directed him to take it to the company's office in New York where the cashier would make payment. He went there and "handed this paper to a man

in the office and he tore it open and he handed me back a piece of paper and I signed it, and gave it back to him and he gave me $72." He returned "to Hudson and Jay [Marine Hospital] to get [his] discharge" and then came to Philadelphia.

His own testimony shows that he had been injured a number of times, sometimes on ships, sometimes in fights. For some of these injuries he received compensation and executed releases and was therefore not unfamiliar with such instruments. For one claim "around April 2nd, 1932," he said he received $4,500. At the time this suit was tried, he had pending an action against the Southern Steamship Company to recover for injuries received in August, 1935. He denied that he claimed in the present suit for the same injuries for which he was claiming in the suit against the Southern Company, but, when confronted with it, admitted his signature to the statement of claim which contained an averment, inter alia, for injury to back and spine. In the present suit he also claimed for injury to the back and spine. The court in banc said: "The testimony produced by the plaintiff is entirely unreliable. He was aware of the attitude taken by the defendant toward his alleged claim. On three different occasions, he accepted money from the agent of the defendant and when he asked for what he claimed was due him, an offer was made him by the agent for the defendant. Showing some reluctance about accepting it, he was told to go home, think it over and come back the next day. This he did. It seems hard to believe that when he knew he was returning for the purpose of adjusting his claim with the agent of the defendant, he would fortify himself with drink and sedatives. We must consider the other statement that he was forced to sign the release under threat of arrest, and we furthermore must not forget that on at least three prior occasions, he had signed releases and was aware therefore of their import. Furthermore, in considering his credibility, we must not forget that when questioned whether in 1935

(two years before) he had made a claim against the Southern Steamship Company for an injury to his back, his answer was No. The statement of claim presented in that case was put in evidence and a reading of Paragraph 8 thereof shows his statement: 'He was violently wounded, jarred and generally shaken about the head, body, spine, arms, legs and feet, and particularly his face and jaw were swollen and discolored, several teeth knocked out and several ribs broken.'

"When one considers that the major portion of his claim of injuries is that he has arthritis from the injury received to his spine, one can see how doubtful this claim for injuries is. . . .

"It therefore seems clear that the condition from which this man alleges he is now suffering was present in 1935. It may well be that the arthritic condition has developed, but the same fracture existed in both X-rays."

The evidence offered by defendants would support a finding that the only injuries received "in the course of his employment," or in the service of the ship, were those which were referred to by the Copenhagen doctor in his report.

Instead of filing his libel in admiralty, where his case would have been tried by a judge without a jury, or of suing at law in the District Court, plaintiff, as he had the right to do, sued in the state court to assert a common-law remedy with trial by jury. It was the duty of the state court to apply the federal law creating the right of action in the same sense in which it would have been applied in the federal courts. This, we think, was done.

The important point now is whether plaintiff has been deprived by local rules of evidence of a substantive right under the federal law. In dealing with this contention, the effect of the evidence in the record may perhaps be considered as follows: plaintiff presented evidence which, if believed (and apart from the release), would have made out a prima facie case; defendants, to de-

stroy that case, relied on evidence that the claims had been discharged by payment and release; in other words, plaintiff had offered proof of his causes of action and defendants had offered proof that they had been released. What should be done with the record in that condition?

It is a rule of evidence in this state, that, to set aside a written release of claims, the trial judge, before he may submit evidence on the subject to the jury, must preliminarily determine the fact that the evidence offered against the release is clear, precise and indubitable: *Scanlon v. Pittsburgh Rys. Co.,* 319 Pa. 477, 480, 181 A. 565; *Aliquippa Nat'l Bank v. Harvey,* 340 Pa. 223, 231, 16 A. 2d 409.

It is unnecessary, in disposing of this appeal, to consider whose duty it was to put in the evidence on the subject because none was excluded; all the evidence is in and the legal question is, what is its effect? As the evidence was insufficient to go to the jury, the learned trial judge should have directed a verdict for defendants on the ground that the release was valid. The verdict not having been directed, as requested by defendants, it was the duty of the court in banc, in considering defendants' motion for judgment non obstante veredicto, to decide whether the evidence should have been submitted to the jury (Act of April 22, 1905, P. L. 286, as amended, 12 PS section 681; *Hostetler v. Kniseley,* 322 Pa. 248, 249-250, 185 A. 300) and if insufficient, to enter judgment for the defendants. In passing on that motion, the learned court concluded that plaintiff's evidence and that offered on his behalf was not sufficient to support a finding that the release was invalid and therefore entered judgment notwithstanding the verdict.

There is no doubt about the principle, for which appellant contends, that a state may not require a plaintiff to prove, as part of his cause of action under federal law, more than what constitutes the cause of action as defined by that law. *Central Vermont Railway v. White,*

238 U. S. 507, held that the state law, requiring a plaintiff in a tort action to show that he was not guilty of contributory negligence, could not be applied in establishing a cause of action under the Federal Employers' Liability Act because the state law, if applied in such action would require a plaintiff to establish as an element of the cause of action a fact which was not part of it by the federal law. *Engel v. Davenport,* 271 U. S. 33, decided that the state could not require the suit to be brought in one year when the Congress had provided that a plaintiff should have two years in which to assert his federal right of action. The application of the same principle necessarily prohibits the state from depriving a defendant of the right to insist that plaintiff shall prove all the elements of his cause of action: *New Orleans & N. E. R. R. Co. v. Harris,* 247 U. S. 367. See also *Great Northern Railway Co. v. Washington,* 300 U. S. 154.

The terms "rule of evidence" and "burden of proof" have different meanings in different contexts.[2] The plaintiff here was not subjected to the burden of proving, as an element of the cause of action, something which was not an element by the federal law. Nothing that plaintiff wished to put in the record was excluded pursuant to the local rule. This rule, as applied in this jurisdiction, is merely a rule of evidence or trial procedure. It probably had its origin in chancery practice and, as this Commonwealth had no court of chancery but administered equity in common-law courts, the rule became part of common-law procedure. It provides for measuring the quantum and quality of proof necessary to guide the judge in determining whether an issue of fact for the

---

[2] Maguire and Epstein: Preliminary Questions of Fact in Determining the Admissibility of Evidence, 40 Harv. L. Rev. 392; Morgan: Functions of Judge and Jury in the Determination of Preliminary Questions of Fact, 43 Harv. L. Rev. 165; Morgan: Instructing the Jury Upon Presumptions and Burden of Proof, 47 Harv. L. Rev. 59; See, generally, Cook: "Substance" and "Procedure" in the Conflict of Laws, 42 Yale L. J. 333.

jury has been presented. We have not been referred to any decision of the Supreme Court determining the point now before us, but it may be noted that in the field of conflict of laws most decisions and text writers agree that rules of evidence are rules of procedure controlled by the law of the forum.[3]

We have been referred to cases in which seamen's releases were considered by admiralty courts. In *The Adonis*, 38 F. (2d) 743, decided in this Circuit, it appeared that a seaman filed a libel for maintenance and cure and for damages for injuries. Respondent set up a release. In reaching the same conclusion that was reached by the judge below, the Circuit Court of Appeals said: "We realize that a release of this kind is not a bar preventing inquiry into the seaman's rights. It can always be looked into. *The Topsy* (D. C.), 44 F. 631; *The David Pratt*, 1 Ware 510, Fed. Cas. No. 3597. But a release of this kind, formally signed, sealed, and witnessed, is, however, prima facie good, and cannot be set aside unless it was obtained by duress, mistake, or, in this case, by fraud, in that the instrument admitted in evidence is not in all respects the instrument the seaman signed. . . .

---

[3] *Singer v. Messina*, 312 Pa. 129, 167 A. 583; *Fortein v. D. L. & W. Ry. Co.*, 90 N. J. L. 137, 100 A. 194; Restatement, Conflict of Laws, sec. 595, comment a, page 710; comment b, page 711. And, see, *Martin v. Burgess*, 82 F.(2d) 321 (C. C. A. 5th). Goodrich, Conflict of Laws (2d ed.), pp. 197, 198: "It has already been stated that matters of procedure are in general determined by the internal law of the forum. It would naturally follow that the rules of evidence should so be classified. These relate to the way in which a case is to be proved, how facts are to be established. If the lex fori requires proof of a certain kind, it would not seem to matter whether the cause of action arose within or without the jurisdiction. . . . The same would be true in deciding the question whether a plaintiff had established, on the facts, a case sufficient to go to the jury." Beale, Conflict of Laws (1935), vol. 3, p. 1611: "The close connection between the ordinary presumption and problems of burden of proof is readily apparent. Hence it is not surprising that courts have held that burden of proof is procedural and governed by the law of the forum."

"The libellant realizing that to put the release out of the case he must sustain the burden of proving that he signed it through duress, fraud, or mistake, says, finally, that he signed it through mistake in that he did not read it, and 'thought it was a receipt for the $125 (he) was getting.' There is no evidence that the libellant could not read. There is evidence that he looked at the paper. He signed it. He is therefore presumed to have known and understood its contents. *The Henry S. Grove* (D. C.), 22 F. (2d) 444. Had he read it, he could not have been misled into believing it was anything short of a release. There is no evidence that the Casualty Company did anything to induce him to sign the paper other than tender him a check for the amount agreed upon, or said anything to make him believe it was a mere receipt. Indeed, the record is bare of a suggestion that the libellant was tricked into signing the paper by false representations of the company's agent. *The Annie L. Mulford* (D. C.), 107 F. 525; *The Belvedere* (D. C.), 100 F. 498. After a careful consideration of the testimony, we are constrained to hold that there is far too little to have justified the trial court, or to justify this court, on trial de novo, in declaring the paper invalid because of duress, fraud, or mistake."

Appellant says that when a release is relied on in the Second Circuit (*Hume v. Moore-McCormack*, 121 F. (2d) 336) the employer must show affirmatively that there was no fraud. With the evidence all before us, it is not important, to consider whether different results on similar evidence could properly be reached in admiralty in the two circuits; presumably the courts would reach the same result, for, after all, the judge, whether in the admiralty or at law is responsible for his decision on the evidence presented. We think there is no substantial difference in the subjective process by which the judge in admiralty arrives at the ultimate fact—the effect to be given to a release—and the same process by which a judge presiding at law would reach or permit the result

to be reached by a jury. Such procedural difference, as exists, is the necessary result of the presence of the jury in one case and not in the other.[4]

We should perhaps add that if we had concluded that the judgment should be reversed on this, plaintiff's appeal, we should not have directed judgment to be entered on the verdict but should have been required, by our consideration of the evidence, to have reinstated defendants' motion for a new trial and remitted the record for consideration by the court below of that motion.

Judgment affirmed.

[4] Wigmore, Evidence (3d ed.), vol. 9, page 278, section 2487, says: "The inquiry peculiarly concerns the procedure in legal controversies; but the settlement of it was not affected by the nature of the tribunal. The tribunal might be a judge, or a jury, or both, so far as regards apportioning the risk of non-persuasion. Nothing has been said, or need be, about a distinction between *judge* and *jury*. But we come now to a peculiar set of rules which have their source in the bipartite constitution of the common-law tribunal. Apart from the distinction of functions between judge and jury, these rules need have had no existence. They owe their existence chiefly to the historic and unquestioned control of the judge over the jury, and to the partial and dependent position of the jury as a member of the tribunal whose functions come into play only within certain limits.

"The treatment of the situation, and the operation of the rules, can best be comprehended by keeping this consideration in mind, namely, that the *opportunity to decide finally upon the evidential material that may be offered does not fall to the jury as a matter of course;* that each party must first with his evidence pass the gauntlet of the judge; and that the judge, as a part of his function in administering the law, is to keep the jury within the bounds of reasonable action. In short, in order to get to the jury on the issue, and bring into play the other burden of proof (in the sense of the risk of non-persuasion of the jury), both parties alike *must first satisfy the judge that they have a quantity of evidence fit to be considered* by the jury, and to form a reasonable basis for the verdict. This duty of satisfying the judge is peculiar in its operation, because if it is not fulfilled, the party in default loses, by order of the judge, and the jury is not given an opportunity to debate and form conclusions as if the issue were open to them."