Edgar Robert ERRION, also known as E. R. Errion and Bob Errion; Amy Errion, Violet Kellerstraus, and C. W. Williamson, Appellants,

v.

Marguerite L. CONNELL, Appellee.

No. 14797.

United States Court of Appeals Ninth Circuit.

Aug. 10, 1956.

Olwell & Boyle, Lee Olwell, Thomas C. Boyle, Seattle, Wash., for appellants.

White, Sutherland & White, William F. White, Portland, Ore., Malcolm S. McLeod, Seattle, Wash., for appellee.

Before STEPHENS, POPE and FEE, Circuit Judges.

STEPHENS, Circuit Judge.

Appellee, Marguerite L. Connell, an eighty-year-old widow, brought this action in the district court for damages together with a prayer for the cancellation of certain instruments under section 10 (b), section 27 and section 29(b) of the Securities Exchange Act of 1934, as amended,[1] and Rule X–10B–5 as promulgated by the Securities Exchange Commission.[2] Named as party defendants were the appellants herein and others who were either dismissed from the case or who did not appeal.

---

1. Act of June 6, 1934, Chapter 404, 48 Stat. 881, Title 15 U.S.C.A. §§ 78a et seq., 78j, 78aa, 78cc(b).

   "§ *78j. Manipulative and deceptive devices.* It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   "(a) * * *

   "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

   "§ *78aa. Jurisdiction of offenses and suits.* The district courts of the United States, the United States District Court for the District of Columbia, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.

   "Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. * * *"

   "78cc. *Validity of contracts.*

   "(a) * * *

   "(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title or any rule or regulation thereunder, shall be void

   "(1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and

   "(2) As regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation: * * *."

2. Title 17 C.F.R. 240, 10b–5. (Sec. 10, 48 Stat. 891, Title 15 U.S.C.A. § 78j.)

   "*Title 17 C.F.R. 240, 10b–5: Employment of manipulative and deceptive devices by any purchaser of a security.* It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

   "(a) To employ any device, scheme or artifice to defraud.

   "(b) To make any untrue statement of a material fact or to omit to state a material fact neces-

The facts of the case were vigorously disputed at the trial. In order to understand the case, we will here state it as the facts were found by the trial court. Whether they find support in the evidence we shall presently discover.

Appellee, Marguerite Connell, was induced by Edgar Robert Errion, hereinafter referred to as Mr. Errion, to enter into a purchase and sale agreement wherein Mrs. Connell would sell and Mr. Errion would purchase securities and other property having a total value of $124,180.09. Mr. Errion was in turn to deed to Mrs. Connell 125 acres of tidelands in Coos Bay, Oregon, at the time of sale represented by Errion to Mrs. Connell to be worth $1200 per acre, or a total of $150,000.

The negotiations for this purchase and sale agreement were undertaken on or about August 22, 1949, and consummated on or about October 19, 1949, with E. R. Errion and/or Holdorf Oyster Corporation. Holdorf Oyster Corporation was held by the trial court to be controlled by Mr. Errion and that it was his *alter ego*. The court found that Mrs. Connell considered that she was engaged in a *single transaction* with Mr. Errion wherein she was selling her securities and other property to Mr. Errion for 125 acres of oyster lands valued at $1200 per acre, and she relied upon Mr. Errion to effect such a transaction. The transaction was consummated in the following manner:—

(a) August 22, 1949, Mrs. Connell deeded to Dwight Holdorf and Opal Holdorf two parcels of real property located in Seattle, Washington.

(b) About September 8, 1949, Mrs. Connell handed to Mr. Errion some $24,000 worth of corporate stock. Mr. Errion's wife, Amy Errion, sold the stock on her own account with and at Merrill, Lynch, Fenner and Beane, in Seattle, Washington, and received $24,624.11 in her own name, which check she used to purchase cashier checks and delivered the checks to her husband.

(c) On September 12, 1949, Errion gave to Mrs. Connell a one-year promissory note for $24,624.11, which the court held Mrs. Connell considered and treated as a receipt for the shares of corporate stock pending delivery to her of the deed to the Oregon lands. Later, Amy Errion received $122.61 as further proceeds from the sale of the stock and she deposited the check in her own account at Salem, Oregon.

(d) Between August 22, 1949, and October 19, 1949, the other securities and property consisting of a promissory note (maturity exceeding nine months), an annuity insurance policy, and three conditional sales contracts upon real property in Seattle, Washington, were transferred either to Dwight Holdorf, Opal Holdorf, and/or Holdorf Oyster Corporation.

(e) About October 19, 1949, with Opal Holdorf present and witnessing the signature of Mrs. Connell, Dwight Holdorf presented to Mrs. Connell a written document receipting for all of the securities and other property, except the corporate shares, together with the promissory note of Errion in the amount of $24,624.11 dated September 12, 1949, for and in consideration of a deed to 125 acres of land in Coos

---

sary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security."

It may be noted that the caption given above to § 240.10b–5 of Title 17 C.F.R., which reads:

"*Employment of manipulative and deceptive devices by any purchaser of a security.*"

was corrected by 16 F.R. 7928, Aug. 11, 1951, to read:

"Employment of manipulative and deceptive devices."

Bay, Oregon. The receipt document was signed on behalf of Holdorf Oyster Corporation by Dwight Holdorf and Katherine Gold, as officers, and by Mrs. Connell, with Opal Holdorf signing as a witness. At this time Dwight Holdorf secured from Mrs. Connell, endorsed in blank, the note of Mr. Errion. Mrs. Connell received a deed of Holdorf Oyster Corporation to 125 acres of land in Coos Bay, Oregon. Federal Documentary Stamps were placed on the deed which would indicate that the consideration from Mrs. Connell was $150,000.

It was brought out at the trial that Mr. Errion induced Mrs. Connell to enter into this transaction by making a number of false representations, the most important of which was the alleged fact that the Port of Coos Bay, Oregon, was planning to condemn the Oregon land and would do so within a year, and that the land was reasonably worth $1200 per acre; but, that in order to establish such a valuation, Mr. Errion was inducing several people to buy the land there so that there would be sales within the area which would support such a valuation. Mr. Errion represented to Mrs. Connell that she therefore would have a profit, represented by the difference between her securities and property values at some $124,000, and the $150,000, the supposed value of the land in Oregon. At the trial, experts testified that the land was worth only $12,500. Mrs. Connell also testified that another reason she entered into the deal was because it enabled her to sell her two homes in Seattle, Washington. There never was a completed condemnation suit of the land.

After the various transactions described above had been completed, there then occurred a series of what counsel for appellee (Mrs. Connell), and the trial judge, described as "lulling activities" on the part of appellants to prevent Mrs. Connell from ascertaining the true facts. The court held that Mr. Errion told Mrs. Connell not to go to Coos Bay to inspect the tidelands; to stay away from the land she had purchased; and to refrain from discussing the deal with anyone. The court further held that, as an added part in "lulling" Mrs. Connell into a feeling of security, appellants did the following things: allowed Mrs. Connell to live rent free in her home in Seattle which she had later conveyed to Holdorf Oyster Corporation; arranged for Mrs. Connell to go with Amy Errion to Southern California from July, 1950, to December, 1950; and had Holdorf Oyster Corporation pay to Mrs. Connell, as a loan, some $4200 in various amounts between September, 1950, and April, 1951, taking in return promissory notes from Mrs. Connell.

Mrs. Connell, on December 14, 1950, while in Southern California with Amy Errion, was presented by Mr. Errion with a written "Indenture of Lease" which Mr. Errion had brought with him from Oregon, and which already had been signed by appellant, C. W. Williamson. Mr. Errion represented to Mrs. Connell that Mr. Williamson was a man from the East with a great amount of wealth and was interested in cultivating oysters in Coos Bay, Oregon. Mr. Errion told Mrs. Connell if she would execute the lease as lessor, Mr. Williamson would undertake and be obligated to cultivate the land by growing oysters and pay to Mrs. Connell one-third of the net earnings as rent for the land, and also would be obligated over a 12-year period to purchase all of Mrs. Connell's land for $1200 per acre. Mr. Errion also, for the first time, told Mrs. Connell that the condemnation action, commenced by the Port of Coos Bay, had been dismissed but the Port had caused damage to the lands and that Mrs. Connell had a cause of action against the Port for such damage and that he, Mr. Errion, would prosecute the same for her and collect a large sum of money as damages for Mrs. Connell. Mr. Errion also told Mrs. Connell that if she at any time needed money she could use the "Indenture of Lease" as security and borrow large sums of money thereon at any bank. The court

held that Mrs. Connell relied on what Errion had represented, and signed the lease, not having read it as well as she might otherwise have done.

The court held that Mr. Williamson knew that his part in the execution of the lease was a segment of an overall scheme to defraud Mrs. Connell; that Mr. Williamson was not a wealthy man from the East; had no intention of buying with his own money any of the oyster lands; and was acting only as a "front" and intended to pay Mrs. Connell such sums of money as Mr. Errion, Dwight Holdorf and/or Holdorf Oyster Corporation might give him for such purposes. The lease actually only obligated Williamson to buy $30,000 worth of the land as Mr. Williamson might select at $1200 an acre.

The court further held that no bank would loan money on such a lease, and that the Port of Coos Bay had not damaged Mrs. Connell's land.

These findings are supported by the evidence.

Mr. Williamson, as a further part of the scheme, paid to Mrs. Connell a total of $22,500 in various installments during the years 1951, 1952, and 1953. This money came from Dwight Holdorf, Holdorf Oyster Corporation, and/or National Forest Products, a corporation, at and upon direction of Mr. Errion.

The court held that National Forest Products was in reality owned by Errion and was the *alter ego* of Errion.

Most of the money paid to Mrs. Connell under this lease, the court held, came from the sale of securities and other property which had been received from Mrs. Connell originally in 1949. By virtue of the $22,500 Mrs. Connell received from Mr. Williamson, she deeded to Williamson 16 of her 125 acres. Mrs. Connell attempted to borrow on the "Indenture of Lease" but was unsuccessful.

In July, 1951, Holdorf Oyster Corporation, as a part of the scheme to defraud Mrs. Connell, had deeded back to Mrs. Connell one of the pieces of property in Seattle and took from Mrs. Connell a promissory note for $16,000, due five years from date, at 6% interest, together with a first mortgage on the property as security. In order to induce Mrs. Connell to execute the note and mortgage, Mr. Errion represented on behalf of Holdorf Oyster Corporation that he knew a person who would buy the property for $36,000, and that if she would execute the note dated back to July, 1950, that Mr. Errion could more easily sell the property, Holdorf Oyster Corporation receiving $16,000, and Mrs. Connell $20,000. Mrs. Connell at this time was just about to depart with Amy Errion for Southern California.

Mr. Errion told Mrs. Connell that only a note was involved and that he would hold it until the real property was sold. Errion then directed the assignment of the mortgage, after having it recorded, to Einar and Dorothy Glaser for $16,000. This $16,000 was paid by check to the order of Holdorf Oyster Corporation and thereafter deposited in the bank account of Dwight and Opal Holdorf, and later dispersed by Dwight Holdorf to and for the use and benefit of Mr. Errion. Much later, Mrs. Connell first learned that a mortgage had been placed on the property. We will discuss later in this opinion the part Amy Errion additionally had in the various transactions, and the part Violet Kellerstraus, the sister of Mr. Errion, had in the fraudulent scheme.

The trial consumed seven days, and at the conclusion the district judge gave judgment for $83,077.49 jointly and severally against E. R. Errion, Amy Errion, Dwight Holdorf, Opal Holdorf, Holdorf Oyster Corporation, C. W. Williamson, and Violet Kellerstraus. Interest at 6% until paid, and costs, were also awarded. The court, further, declared void, and cancelled, certain of the moving instruments involved, which are identified in the margin.[3] Defendants Einar and Dorothy Glaser were dismissed.

3. Portion of Judgment of the District Court:

(a) The unwritten but executed contract of sale between plaintiff and de-

## Jurisdiction

First, appellants argue that the district court lacked jurisdiction over Mrs. Connell's cause of action for the reason that Mrs. Connell did not establish that any act or transaction, constituting a violation of the Securities Exchange Act of 1934 or any rule of the Commission promulgated thereunder, occurred within the jurisdiction of the trial court (United States District Court for the Western District of Washington). This is a two-pronged attack. Appellants allege (a) that the acts of appellants are not within the 1934 Act or rules thereunder, and (b) that if they are, it was not shown that they occurred in the Western District of Washington.

Appellants are in error in arguing that this court's opinion in Fratt v. Robinson, 9 Cir., 1953, 203 F.2d 627, 37 A.L.R.2d 636, is authority for the proposition that the Securities Exchange Act of 1934 was enacted *only* for the purpose of controlling security transactions on the stock exchanges and acts directly related thereto. We held there directly to the contrary, stating, 203 F.2d at page 630:

"We think the whole tenor of the Act indicates that its operative procedure is by regulation of security-transfer businesses and persons who function in or through them. That 'stock exchange' and 'over-the-counter markets' mean, in the Act, any security-transfer business wherein the business of marketing securities is conducted. We think the authors of the Act realized that the remedy of the abuses sought to be applied by the Act would be more or less completely effective in the proportion of security-trading done on or through the established businesses. To this end § 10 was enacted in order that those who desire to promote crooked deals would see little advantage in using devious methods to by-pass the security-dealing business houses under regulation. And, further, that prospective crooked deals would be under a powerful deterrent by reason of the fact that perpetrators of fraud in security exchanges would be in violation of federal laws and, as we shall see in our discussion under the next point to be considered herein, would be answerable in damages in federal courts to those they have injured."

■ There is in this case one feature which is unusual in character and as yet has not been discussed or decided in any case. We are squarely faced with the question here of whether a district court under the Act of 1934 has jurisdiction

fendants wherein plaintiff sold $124,180.-09 worth of securities and other property to E. R. Errion and/or Holdorf Oyster Corporation in a single indivisible transaction for the consideration of 125 acres of tidelands in Coos Bay, Oregon, worth only $12,500.

(b) That certain promissory note executed by E. R. Errion dated September 12, 1949, and delivered to plaintiff in amount of $24,624.11 and endorsed in blank by plaintiff, as set forth in Exhibit A-3.

(c) That certain written "Indenture of Lease" dated December 14, 1950, and executed by plaintiff and defendant C. W. Williamson, as set forth in Exhibit 4.

(d) That certain written addendum to correction of description in lease, dated June 17, 1952, and connected with the "Indenture of Lease" executed December 14, 1950, by and between plaintiff and C. W. Williamson, as set forth in Exhibit 5.

(e) Each and all of those certain promissory notes executed by plaintiff to the order of Holdorf Oyster Corporation in various amounts, as attached to Exhibit 77.

(f) Each and all of those certain promissory notes executed by plaintiff to the order of Holdorf Oyster Corporation in various amounts, as attached to Exhibit 78.

(g) That certain promissory note dated July 12, 1950, and executed by plaintiff to the order of Holdorf Oyster Corporation in the amount of $16,000, payable in five years from date thereof, as set forth in Exhibit 6, so far only as the title or interest of Holdorf Oyster Corporation is concerned.

when there is a *single transaction or scheme* which involves both securities and non-securities. If one is defrauded out of non-securities or securities, his remedy can be an action for common-law fraud in the state courts. The Act of 1934 merely created an additional remedy for one who had been defrauded of his securities.

■ Appellants argue that because non-securities are involved here as well as securities, that appellee should have brought her action in the state court. We disagree with this contention. We are of the opinion that the Act of 1934 was designed to cut out "sharp practices" and fraudulent schemes involving securities, and the fact that there may be a co-mingling of securities with non-securities in the scheme does not oust the United States District Court of jurisdiction.

The Securities and Exchange Commission appeared by brief as *amicus curiae* on motions to dismiss, and we agree with the reasoning found at page 11 of the Commission's brief in which it is stated:

"The fact that by this purchase defendants also acquired non-securities does not render Rule X–10B–5 inapplicable. So far as we know, this is the first action under Rule X–10B–5 which has involved such a combination purchase; and so there is no prior court ruling. The statute and rule, however, are literally applicable; and it is obvious that a contrary holding would afford a rather simple method for frustrating the purpose of the legislation. Were a fraudulent buyer of securities able to avoid liability under Rule X–10B–5 merely by purchasing a non-security from the seller at the same time, it is evident that the rule could be rendered meaningless."

The case of Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, is cited by appellee wherein the court held that a federal court had jurisdiction to determine damages in a single action for copyright infringement (federal question)

and unfair competition (a state question), both arising out of the same set of facts. The court in Hurn v. Oursler, supra, made this distinction, 289 U.S. at page 245, 53 S.Ct. at page 589:

"But the rule does not go so far as to permit a federal court to assume jurisdiction of a *separate and distinct* nonfederal cause of action because it is joined in the same complaint with a federal cause of action. The distinction to be observed is between a case where two distinct grounds in support of a *single cause of action* are alleged, one only of which presents a federal question, and a case where two separate and distinct causes of action are alleged, one only of which is federal in character. In the former, where the federal question averred is not plainly wanting in substance, the federal court, even though the federal ground be not established, may nevertheless retain and dispose of the case upon the nonfederal ground; in the latter it may not do so upon the nonfederal cause of action." [Emphasis supplied.]

■ It is alleged in the complaint in our case, and the trial court found, a *single cause of action* involving a *single fraudulent scheme* to defraud Mrs. Connell of her property. There were involved two types of property, one being securities over which the federal court had jurisdiction, and the other non-securities over which the federal court normally has no jurisdiction. But the single fraudulent scheme arising out of the same set of facts encompassed both types of property. The thought of requiring two law suits in this situation is untenable. We therefore hold that the trial court could correctly award damages for the entire fraudulent scheme, even though non-securities were involved.

Lastly, as a jurisdictional argument, appellants claim that appellee did not establish that any act or transaction constituting a violation of the Security Exchange Act of 1934 or any rule of the

Commission promulgated thereunder, occurred within the Western District of Washington.

▆▆▆▆ This court held in Fratt v. Robinson, supra, 9 Cir., 1953, 203 F.2d 627, 634, 37 A.L.R.2d 636, that:

"* * * the crookedness need not appear at all in the instrumentality used",

but it was sufficient if it were shown that fraud was used or employed *in connection with* the use of instruments of interstate commerce or the mails. Therefore, all that is required is a showing that instruments of interstate commerce or the mails were used and *in connection with that use* a fraudulent act occurred within the Western District of Washington. There were many instances of uses of interstate commerce or of the mails apparently employed in this case, but we think it sufficient to point out that counsel for appellants stipulated at the trial that instruments of interstate commerce were used when Amy Errion sold the stock at Merrill, Lynch, Fenner and Beane in Seattle, Washington. An interstate teletype was used. Portions of the securities sold consisted of General Motors stock which was sold on the New York Stock Exchange. We need not point out other instances of uses of interstate facilities or of the mails.

As to the acts occurring within the Western District of Washington, the record shows numerous instances of transactions of appellants, including conversations, transfers of title to real property, issuance of checks, and other dealings occurring within the City of Seattle. Deeds were recorded in the Western District of Washington. Although the record does not affirmatively state that *all* transactions occurred at Mrs. Connell's home in Seattle, it is easily inferable, and no other inference could be drawn, that a great majority of the conversations and acts did so occur in her Seattle home. It is sufficient if one act occurred in Seattle, Washington.

We likewise point out to counsel for appellants that we do not find in the record before us any designation of Points on Appeal as required by the rules of this court,[4] in which such an issue should be properly raised.

We hold that the trial court had jurisdiction.

### Statute of Limitations

Appellants argue that appellee's cause of action was barred by the statute of limitations since Mrs. Connell's cause of action was predicated on transfers of property that occurred from August to October, 1949, and, since her complaint was not filed until August 31, 1953, the applicable statutory period had expired.

▆▆▆ This court held in Fratt v. Robinson, supra, 9 Cir., 1953, 203 F.2d 627, at page 634, that under the Securities Exchange Act of 1934, the statute of limitations of the State of Washington applied where the unlawful acts occurred in Washington. This is true in our instant case. The applicable Washington statute provides for a three-year statute of limitation for fraud and further provides that the cause of action is not deemed to have accrued until discovery by the aggrieved party of the facts constituting the fraud.[5]

▆▆▆ The trial court held that appellee was not barred by the statute of limitations and held that appellee did not have any reason to discover facts that would reveal to her that she had been defrauded until well within three years' time from the date Mrs. Connell's complaint was filed, and that when she did discover the fraud she acted promptly. The court further found that appellants had conducted "lulling" activities which had prevented Mrs. Connell from discovering facts which would have revealed to her the fraud. We uphold this finding by the trial judge.

---

4. See Rule 17 subd. 6, of Rules of the United States Court of Appeals for the Ninth Circuit.

5. Rem.Rev.Stat. § 159, subd. 4, State of Washington.

■ The record abounds with evidence that appellants did conduct such "lulling" activities. We do not agree with appellants that the mere fact that Mrs. Connell had in her possession for about one month the promissory note executed by Mr. Errion when she handed over the securities is in itself sufficient to charge her with constructive knowledge of the fraud or that she did not use due diligence in investigating further. Neither is the fact that she consulted a college professor as to yields one could expect from oyster lands, sufficient. The trial judge was right in holding that the statute of limitations had not run.

## Sufficiency of the Evidence

■ The findings of fraud are not clearly erroneous. The trial judge was most emphatic in his statements as to what degree of proof was required as to each and every appellant, and he clearly stated what were the circumstances and transactions which supported a finding of a fraudulent part played by each appellant.

■ The trial judge regarded, and properly, that all the appellants were engaged in *one single fraudulent scheme.*.

As to Violet Kellerstraus: She was a sister of Mr. Errion and lived in an adjoining apartment with him. She had a joint bank account with Mr. Errion, and in other particulars was in a close relationship with him. She took title to one of Mrs. Connell's homes in Seattle in her own name and when the home was sold she converted the proceeds into cashier's checks and deposited them to Holdorf's account and her joint account with Mr. Errion. Her testimony on the stand was fantastic and unbelievable, and the judge commented at the conclusion of the trial on her attitude and response. We therefore conclude, as did the trial judge, that she couldn't have undertaken the sale of Mrs. Connell's home in Seattle, secured the funds, signed the documentary papers, distributed the funds received, and have done the secretarial work for Errion without having knowledge of the scheme, and without knowingly cooperating in perpetuating the fraud.

As to Amy Errion: Amy Errion, the wife of Mr. Errion, performed certain acts which, in other circumstances might appear innocent. But in the circumstances and facts of this case, it is clear that she knowingly participated in the fraudulent scheme. She sold the stocks secured from Mrs. Connell. She was present when conversations took place with Mrs. Connell. She took what the judge described as a "lulling trip" with Mrs. Connell to Southern California, in order to prevent Mrs. Connell from ascertaining the true facts. Mrs. Errion later secured some $122 from Merrill, Lynch, Fenner and Beane which she deposited to her own account. The evidence supports a finding of participation in the scheme.

As to C. W. Williamson: Mr. Williamson entered into the scheme later. His own statements clearly show that he either had an express, or a tacit, agreement with the other appellants as to the fraudulent scheme. His actions clearly show that he was merely projected into the plan in order to act as a conduit to "feed" Mrs. Connell funds in order to further lull her into a sense of security. The funds were not his own, but were from sources over which Mr. Errion had control. The so-called "Indenture of Lease" required him to start production of oysters on the land but he admitted that he did not. Clearly, he was implicated in the scheme.

Appellants' argument that Mrs. Connell and Dwight Holdorf were impeached and thus their testimony should be entirely discredited, is without merit. Neither were impeached to the extent that their entire testimony should be disbelieved. The trial judge made this clear in his decision. We add that not only did the trial judge have the testimony of Mrs. Connell and Mr. Holdorf, but he also had the additional benefit of many cancelled checks and other documentary evidence, as well as the testimony of other witnesses and defendants.

### Pari-Delicto

The argument of appellants that Mrs. Connell should not recover because she was in *pari-delicto* with appellants as to the attempt to put a false valuation on the oyster lands at Coos Bay, Oregon, we find without merit and deserving of no comment.

### Refusal of Continuance

The trial judge refused to continue the trial at the request of counsel for Mr. Errion. It was alleged at the trial that Mr. Errion, a diabetic, was suffering from nervous exhaustion or "battle fatigue", and thus the trial should be continued. A doctor testified that he could not state when Mr. Errion would be able to appear. The trial judge was most careful to elicit the precise nature of Mr. Errion's condition as much as possible, but the trial judge stated that he could not continue the trial in view of the advanced age of Mrs. Connell, and her own disturbed mental and physical condition which was certified by a doctor's letter. He said that he also felt that he could not continue the trial since he had no way of knowing when Mr. Errion would be available, if ever.

We hold that the trial judge was entirely within his sound discretion in refusing a continuance under the circumstances of this case.

### Service on Violet Kellerstraus

Violet Kellerstraus, at the trial, made several motions to quash service of summons. The trial judge took oral testimony from Violet Kellerstraus; from a neighbor of Mrs. Kellerstraus; and from Deputy Sheriff Collacutt of Multnomah County, Oregon, who had been appointed by the trial court to serve process.

There was a direct conflict of testimony as to whether, when Sheriff Collacutt pitched the papers through a hole in the screendoor of Violet Keller-

straus's apartment, he saw her, spoke to her, and when she ducked behind a door told her brother Fred Errion that he was making service on her. We have read the testimony and hold that the decision of the trial judge that service was made has ample support in the evidence. The weight to be given to conflicting testimony is within the discretion of the trial judge who, in this instance, had the parties before him. We find no abuse in that discretion.[6]

Judgment affirmed.

---

6. Since we hold that service was made on Violet Kellerstraus, we need not consider whether service on Fred Errion would in itself have been sufficient, and also need not consider the effect of Violet Kellerstraus' answering the complaint.