CARL L. DANIELSON AND PAULINE S. DANIELSON, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1779–63, 5489–63, 344–64, 473–64.    Filed August 29, 1968.

*Sidney B. Gambill, Charles C. Cohen,* and *Linn V. Phillips, Jr.,* for the petitioners.

*John W. Tissue,* for the respondent.

---

[1] The proceedings of the following petitioners are consolidated herewith: Helen P. Sherman, docket No. 5489–63; Estate of Jacob F. Schaffner, Deceased, Elizabeth Schaffner and Erwin Marsch, Executors, and Elizabeth Schaffner, docket No. 344–64; and Hugh E. McLennan and Katherine McLennan, docket No. 473–64.

DAWSON, *Judge:* These cases are now before the Court on remand from the U.S. Court of Appeals for the Third Circuit pursuant to mandate issued on November 7, 1967. The cases were originally heard by this Court on November 17 and 18, 1964, and decisions were entered in favor of petitioners on September 22, 1965, in accordance with an opinion filed on July 12, 1965, which is reported in 44 T.C. 549. Upon petitions for review filed by the Commissioner in the U.S. Court of Appeals for the Third Circuit, the cases were argued before a three-member panel on September 16, 1966. A rehearing before the Court of Appeals en banc was held pursuant to an order entered sua sponte on December 20, 1966. In an opinion filed May 2, 1967, and reported in 378 F. 2d 771, the Court of Appeals reversed the decisions of this Court by a vote of 4 to 3 and remanded the cases "so that the parties may be afforded a further opportunity to produce evidence in accordance with the principles expressed in this opinion." Petitioners applied to the Supreme Court of the United States at No. 382, October Term 1967, for a writ of certiorari, which was opposed by the Solicitor General and denied by the Supreme Court on October 9, 1967, in 389 U.S. 858.

Accordingly, pursuant to the mandate issued by the Court of Appeals, this Court entered an order dated November 14, 1967, directing the petitioners to file amended petitions alleging appropriate assignments of error with respect to the issues of fraud, duress, or undue influence as mentioned in the opinion of the Court of Appeals. Respondent was directed to answer the amended petitions. Thereafter, the amended petitions were filed. Each alleges that the written agreements dated November 16, 1959, wherein petitioners agreed not to compete against Thrift Investment Corp. for 6 years "was procured by fraud on the part of an officer of Thrift, Paul M. Hickox." Respondent in his answers to the amended petitions has denied this allegation.

A further hearing was held on January 16, 1968, in Pittsburgh, Pa. The general background of these cases is no longer in dispute, and our findings of fact (44 T.C. 549) were in no way disturbed by the Court of Appeals. In reversing us, the Court of Appeals adopted a new rule that (378 F. 2d at 775) —

a party can challenge the tax consequences by his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its enforceability because of mistake, undue influence, fraud, duress, etc.

The Court of Appeals further stated (378 F. 2d at 777, 779) :

Even in these circumstances, we are inclined to believe that the "strong proof" rule would require that the taxpayer be held to his agreement absent proof of the type which would negate it in an action between the parties to the agree-

ment. It our belief is unwarranted then we nevertheless conclude that a taxpayer who enters into a transaction of this type to sell his shares and executes a covenant not to compete for a consideration specifically allocated to the covenant may not, absent a showing of fraud, undue influence and the like on the part of the other party, challenge the allocation for tax purposes. We so conclude even though the evidence, as here, would support a finding that the explicit allocation had no independent basis in fact or arguable relationship with business reality. Such evidence can have no independent legal significance in cases where the consideration is allocated by the parties in their agreement. It would be relevant, but not conclusive, evidence only if some attack is made on the written agreement by a party claiming that because of fraud, etc., it is not his conscious agreement.

\*         \*         \*         \*         \*         \*         \*

However, under the rule here adopted, if either of the parties to a covenant not to compete attempted, in an action against the other, to avoid or alter the agreement he would have a heavy burden of showing fraud, duress, undue influence and the like under what may loosely be called common-law principles.

We are thus confronted, on this remand, with one narrow question: were petitioners fraudulently induced by Thrift Investment Corp. to sign individual agreements not to compete in conjunction with the sale of their stock in Butler Loan Co. so as to nullify for Federal tax purposes the effect of such agreements? In order to resolve this question additional findings of fact must be made.

### SUPPLEMENTAL FINDINGS OF FACT

When Butler County Loan Co. (herein called Butler Loan) was offered for sale in October 1959 it held small loan receivables of approximately $254,000 and its subsidiaries owned consumer discount receivables of approximately $9,500.

Among several responses to the solicitations of offers to purchase Butler Loan were offers to pay substantial premiums on the receivables. In addition to the offer made by Thrift Investment Corp. (herein called Thrift), one small loan company offered $358,600.74, and another small loan company offered $380,129.16.

The stockholders and directors of Butler Loan, including the petitioners, were informed of the receipt of such offers at a special meeting held on November 3, 1959. The various offers were then considered and the decision was made to accept the Thrift offer. The minutes of the meeting of November 3, 1959, further reflect that—

It is unanimously agreed that all directors and/or stockholders present are on record that they individually and collectively will enter a noncompete agreement in Butler area for a period of three years.

Prior to the submission of its offer, Thrift had examined and graded the Butler Loan receivables. The calculation resulted in a total valua-

tion thereon by Thrift of $264,395. Thrift could have afforded to pay a premium on the receivables of approximately $103,700.

Paul M. Hickox, executive vice president of Thrift, thought at the time the Thrift offer was submitted that amounts paid pursuant to a noncompetition agreement could be amortized and deducted for Federal tax purposes.

Prior to the submission of its offer to Butler Loan, Thrift had decided that it would ask the stockholders of Butler Loan to sign individual agreements not to compete and that it would allocate as consideration for the covenants the amount of the premium calculated on the receivables. At the time the offer was submitted Hickox thought that amounts received under a noncompetition agreement would be treated as ordinary income to the recipients for Federal tax purposes.

Shortly after the special meeting of Butler Loan stockholders and directors, Thrift was advised that the cash offer for the shares contained in its letter of November 2, 1959, was accepted. Alvin C. Shukis (herein called Shukis), the manager of Butler Loan, then sent a telegram to Thrift stating that he was going to exercise his option with respect to the additional 90 shares on which he held an option. Thereupon, Hickox sent a letter dated November 5, 1959, to Hugh E. McLennan, president of Butler Loan which reads, in pertinent part, as follows:

> I am enclosing three copies of an agreement for purchase and sale and nine copies of a non-competition agreement. If it is convenient, all shareholders can sign the original and duplicate of the agreement for purchase and sale, and I provided an extra copy in the event that you find it inconvenient to get all five signatures on the same form.
>
> The non-competition agreement is to be signed separately by each shareholder. I am under the impression that there are five shareholders, but I am not sure. If you need more copies of either of these forms please let me know.
>
> I will be glad to answer any questions you may have on the terms of these forms.

The purpose of the letter was to show to the Butler Loan shareholders the documents drafted by Thrift's attorneys that Thrift would require in closing the transaction. Thrift transmitted copies of the documents to permit McLennan to distribute them to the other shareholders of Butler Loan. Thrift felt that it was discharging an obligation to reveal the precise requirements and terms demanded by it in the transaction by sending the agreements that it would require to be executed at the closing. The agreements were blank as to amounts because Thrift was unable to fill in proper amounts due to the Shukis dispute which involved the amount to be paid for his stock.

On November 5, 1959, Hickox had no idea how the closing of the Thrift-Butler Loan transaction would take place. He did not know how many shareholders were involved in closing with Butler Loan.

He did not know what procedure McLennan and the other Butler Loan shareholders might wish to employ with respect to the closing. He did not expect that the agreement forms sent by him to McLennan would be returned to Thrift signed in blank. It was anticipated by Hickox that McLennan and the Butler group would need to know what was to be placed in the blanks on the agreements. He did not know what the Butler group might be able to work out with respect to the Shukis controversy, but he assumed that such problems would be the subject of discussion between counsel for the two parties. He expected that the detailed closing arrangements would be made by the respective lawyers for Thrift and the petitioners.

Hickox's letter of November 5, 1959, and the agreements were received by McLennan, who gave the letter and agreements to Linn V. Phillips, Jr., attorney for petitioners, who placed them in his file. The agreements were not distributed to the petitioners.

On the date of the closing, November 16, 1959, Hickox was not aware that copies of agreements sent to McLennan had not been given to the petitioners and were instead in Phillips' file.

Between November 5, 1959, and November 16, 1959, Hickox was not contacted by any of the petitioners. However, during such period, Phillips did call Hickox, who informed him that Thrift was represented by a Mr. Kyle.

Hickox had given Kyle all of the information on which Thrift based its offering price per share for the stock of Butler Loan as well as the consideration for the noncompetition agreements, the numbers of shares involved in the transaction, and the name of the president of Butler Loan and his phone number.

It was Hickox's understanding at all times that the petitioners were represented by Phillips. In providing information to Thrift's attorney, Kyle, Hickox placed no limitations upon him in disclosing information to Phillips concerning Thrift's offer to Butler Loan.

The office file of Kyle contained three tablet sheets of notes covering the substance of a telephone conversation with Phillips. The notes reflected the consideration to be paid for the agreements not to compete, the book value to be paid for the stock of Butler Loan, and some figures pertaining to a proposed escrow agreement that Phillips was preparing. Kyle reported to Hickox at various times that he had been in contact with Phillips and that they had held discussions with respect to the transaction.

Hickox did not know the substance of discussions between Phillips and Kyle. He did know that Kyle had all the information available to him that was available to Hickox prior to the date of the closing. As far as Hickox was concerned, the amounts of consideration that were to be paid by Thrift were settled and the matter rested in the hands of counsel for both parties.

The only question remaining insofar as Thrift was concerned on the date of the closing was the allocation of the noncompete consideration among the shareholders of Butler Loan. Hickox believed that the lawyers would be able to settle this question after the terms of the settlement between Shukis and the petitioners were disclosed to them.

The petitioners' delay in settling their controversy with Shukis was the cause for delaying the closing in Thrift's office on November 16, 1959. Thrift was prepared to close without delay on that date, but it did not know the status of the Shukis controversy. This situation not only left the matter of the allocation of noncompete consideration open, but also left open the basic question of whether there would be any closing between Thrift and the petitioners.

Thrift knew that Butler Loan had received other offers, but the substance of such other offers was not known to it. Thrift did know that as a matter of practice in the industry other companies made lump-sum offers. Thrift had no reason to depart from that practice in making its offer. The offer was made with the understanding that it would be compared with offers received by Butler Loan from other companies. At the Butler Loan shareholders meeting held on November 3, 1959, at which Thrift's offer was accepted, petitioners recognized that they would be required to sign a noncompete agreement in conjunction with the sale, and they agreed to do so. Phillips knew that it was normal for purchasers to require noncompete agreements in this type of transaction. The form and terms of the offer were not intended to and did not mislead the petitioners.

It was the intention of Thrift to submit to Butler Loan the largest consideration possible for the stock and noncompete agreement that could be devised. Thrift believed that it had employed a method of calculating the amounts to be paid for the stock of Butler Loan Co. and noncompete agreements which constituted the largest offer that it could make to petitioners. Because of the method of calculation which produced the offer by Thrift, and because it is a firm policy of Thrift not to purchase a small loan company, such as Butler Loan, without requiring agreements not to compete, it was important to Thrift that the petitioners accept the transaction on the basis of the offer submitted by Thrift. If its offer had been unacceptable to the Butler Loan shareholders, Thrift would not have closed the transaction.

Kyle, attorney for Thrift and a partner in the firm representing Thrift, was unable to attend the closing in Thrift's office on November 16, 1959. Consequently, Rex Rowland, another partner in the same law firm, agreed to attend the closing. Rowland brought copies of the agreements from his law office to the Thrift offices for the closing. He knew that copies of the agreements had been sent to McLennan and Phillips and he assumed that all of the parties had previously read the agreements. Rowland placed the agreements on the table in the con-

ference room and they remained aviable for the petitioners' examination throughout the afternoon of November 16, 1959. All of the petitioners were present during the closing, as well as Phillips, Rowland, and Hickox.

Rowland was present in the conference room in the Thrift offices throughout the afternoon of November 16, 1959, until after the closing. During the entire afternoon, he was only absent to get a drink of water, to take Phillips to McCaffrey's office where the calculator was located, and later to verify with McCaffrey the figures read off by Phillips for insertion in the agreements. Rowland heard the conversations that took place between all of the parties at the closing.

On November 16, 1959, after the settlement was reached between the petitioners and Shukis, calculations of amounts to be filled in the agreements were made on a calculator by McCaffrey, vice president and treasurer of Thrift. He was located in the accounting department of the Thrift offices across the hallway from the room in which the petitioners were situated.

Phillips was present and actively assisted McCaffrey in making the calculations. It was McCaffrey's understanding that Phillips was there to represent the petitioners, to make sure that the allocation of the noncompete consideration was proper so that each shareholder got his fair share in relation to all of the other shareholders.

Phillips was present throughout the entire time that the calculations were made. He assisted and wrote down figures while McCaffrey operated the calculator. Phillips made no statements or remarks to McCaffrey concerning the size of any amounts that he was writing down. It was McCaffrey's observation that Phillips was following along with the calculation and performing the function of representing the petitioners by verifying the accuracy of the figures and allocation. Phillips returned from McCaffrey's office after the calculations were made. Rowland then inserted the dates, names, and amounts in the agreements while he and all of the petitioners were seated around the table in the conference room in the offices of Thrift.

Rowland obtained the information to put in each agreement from Phillips. Phillips was beside Rowland during the time that he put the information in the agreements, and Phillips was looking at the agreements during the time that Rowland was completing them.

After the agreements were completed and before the petitioners signed them, Rowland took them to McCaffrey to verify the correctness of the figures that he had inserted at the direction of Phillips. After Rowland consulted with McCaffrey and was satisfied that the figures were correct as received from Phillips, Rowland returned to the conference room with the agreements.

At that time the agreements were ready to be signed. Hickox was to sign on behalf of Thrift. He was informed that the agreements were

ready to be executed and he was present in the conference room. Hickox considered himself an observer to the closing because the lawyers for the parties were handling the transaction.

Prior to the completion of the signing of the agreement and delivery of the checks, at the table in the conference room in Thrift's office around which Hickox, the lawyers, and all of the petitioners were seated, Hickox brought up the subject of taxes by stating in accordance with a firm company policy that Thrift was not representing that consideration for agreements not to compete was capital gain. He also stated to them that he suspected that sellers in the past had reported noncompete consideration as capital gains but that Thrift was not representing it to be capital gains because it was the intention of Thrift to amortize the noncompete consideration. Hickox stated to petitioners that the purpose of the allocations to the noncompetition agreements was to facilitate matters for Thrift taxwise and that the agreements were merely on a company form to help Thrift secure a tax advantage. He also said that it was to petitioners advantage to sign the forms and that they would not be "hurt" by signing. Rowland then passed the agreements to petitioners with the assistance of Phillips.

There was no lengthy discussion of the tax aspects of the transaction. During the time that Rowland was in the Thrift offices for the closing he did not discuss any tax matters pertaining to the transaction with Phillips or the petitioners. He did not hear any discussion of the tax aspects of the transaction at the closing other than the remarks of Hickox. Neither Rowland nor Hickox was informed that the petitioners sought any particular tax results from their transaction with Thrift.

Neither Phillips nor the petitioners requested that the closing be postponed for the purpose of considering the tax consequences of the transaction, although Thrift would not have objected to granting a postponement if one had been sought.

At the closing with Thrift, Phillips represented all of the petitioners. He was present during the entire afternoon of November 16, 1959, in the Thrift offices. He attended to the petitioners' interests through the time the papers were signed in the conference room in Thrift's offices. He told petitioners to "go ahead and sign" the agreements.

Hickox was not aware on November 16, 1959, that Phillips did not consider himself competent to represent petitioners with respect to the tax considerations involved in the transaction between them and Thrift. None of the petitioners relying upon Phillips asked any specific advice from him at the closing with respect to the agreements not to compete.

Paul M. Hickox has a good reputation for honesty and integrity in business.

None of the petitioners have ever contacted Thrift to complain about the fact that Thrift required them to execute agreements not to compete. They have not threatened to file or filed any suit against Thrift with respect to the agreements not to compete that were executed by them on November 16, 1959. Petitioners have not made any charges of misrepresentation or fraud against Thrift except in this litigation. Hickox was not aware of the fraud allegations in this litigation until shortly before Christmas 1967, which was less than 1 month before the trial of this case on January 16, 1968, and more than 8 years after the date of the closing on November 16, 1959.

At the closing on November 16, 1959, Thrift submitted to petitioner Helen P. Sherman, for execution by her, an agreement entitled "Noncompetition Agreement with Thrift Investment Corporation," agreeing not to compete during a period of 6 years within 15 miles of the city of Butler and setting forth as a specific consideration for the agreement the amount of $27,485.76. Helen Sherman did not refuse to sign the agreement. She intended to and thought that she had signed it, but no executed copy of her agreement not to compete has been found.

Helen Sherman saw the agreements that were brought into the room at the Thrift offices for execution by petitioners at the closing. It was the understanding of Rowland that, along with all of the other shareholders of Butler Loan, she received the agreements that Thrift intended for her to sign and that she did in fact execute them. She signed everything that she was requested to sign on that day and believes that she signed the noncompetition agreement.

Helen Sherman did sign the "Agreement for Purchase and Sale of Capital Stock" of Butler County Loan Co. and was paid $70,715.52 by check from Thrift. A voucher attached to the check bore the explanation that payment was made as "consideration for capital stock and agreement not to compete—Butler County Loan Company." The stock sale agreement clearly showed that she owned 194 shares of such stock, for which she was being paid $222.83382 per share.

When Helen Sherman received a letter asking her to sign a replacement copy of her agreement, she said in response that the agreement was given to her on the day of closing and that she had probably signed it.

At the closing of the sale of the stock of Butler County Loan Co. to Thrift on November 16, 1959, petitioner Helen P. Sherman entered into a written agreement not to compete with Thrift upon the same general terms and conditions as the other petitioners, for which she received consideration in the amount of $27,485.76.

ULTIMATE FINDINGS

1. The offer letter sent by and the terms of the offer made by Thrift to the petitioners for the purchase of their stock in the Butler Loan and the agreements not to compete were submitted in good faith and without any intent on behalf of Thrift or any of its officers to defraud the petitioners.

2. Neither Hickox nor any other person on behalf of Thrift made any representation or followed any course of conduct with intent to defraud petitioners in regard to the transaction in which petitioners executed individual agreements not to compete in conjunction with their sale of Butler Loan stock to Thrift.

3. Rowland, the attorney who represented Thrift on the day of the closing, made no representations or statements with respect to the tax consequences of the transaction which occurred on November 16, 1959, between petitioners and Thrift.

4. Petitioners were represented at the closing with Thrift by Phillips, an attorney who was or should have been familiar with the terms and consequences of the transaction between petitioner and Thrift, and petitioners signed the agreements in reliance upon his advice and not upon any information or statements made by Hickox, who was not an attorney.

OPINION

Petitioners have neither pleaded nor argued that mistake, duress, or undue influence is involved. They rely solely upon allegations of fraud in their amended petitions [2] which have been denied by respondent.

It is claimed by petitioners that the principles of Pennsylvania law are not relevant in these cases. They contend that this Court should look to the provisions of the Securities Exchange Act of 1934 (15 U.S.C. sec. 78a *et seq.*), and rule 10b–5 (17 C.F.R. sec. 240.10b–5) of the Securities and Exchange Commission to establish a foundation upon which petitioners can prevail. In support of their contention, petitioners cite, e.g., *Kardon* v. *National Gypsum Co.*, 69 F. Supp. 512 (E.D. Pa. 1946); *Fratt* v. *Robinson*, 203 F. 2d 627 (C.A. 9, 1953); *Hooper* v. *Mountain States Securities Corporation*, 282 F. 2d 195 (C.A. 5, 1960); *Janigan* v. *Taylor*, 344 F. 2d 781 (C.A. 1, 1965); *Ellis* v. *Carter*, 291 F. 2d 270 (C.A. 9, 1961); *Matheson* v. *Armbrust*, 284 F. 2d 670 (C.A. 9, 1960); *Errion* v. *Connell*, 236 F. 2d 447 (C.A. 9, 1956); and *Speed* v. *Transamerica Corporation*, 235 F. 2d 369 (C.A. 3, 1956). All of these cases hold or affirm the principle that a violation of

---

[2] Petitioners have not pleaded that the instrumentalities of interstate commerce were used to defraud them, nor the manner in which fraud was thereby committed by Thrift. Therefore, they have failed to comply in this respect with the provisions of Rule 7(c)(4) (B)(5) of this Court's Rules of Practice.

rule 10b–5 gives rise to a private right of action in Federal court whereby a defrauded party may recover damages for a tort.

In view of the mandate of the Court of Appeals for the Third Circuit herein, we believe the principle enunciated in the above-cited cases is inapplicable in this litigation. The Court of Appeals said that these petitioners can succeed "only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its enforceability because of mistake, undue influence, fraud, duress, etc." *Commissioner* v. *Danielson, supra* at 775. In fact, the Court of Appeals precisely stated that the petitioners have "a heavy burden of showing fraud * * * under what may be loosely called common-law principles." Plainly, the Court of Appeals did not require, as petitioners argue, that they adduce "proof which would have enabled them to maintain a cause of action against Thrift for recission and damages."

There is no entirely uniform rule as to the degree of proof necessary to prevail in such fraud cases. Each jurisdiction has evolved its own standards, although it can be fairly concluded that the burden of proof is indeed "heavy" in all courts. Probably the most common term used by virtually all courts in defining the burden is that fraud must be established by "clear" evidence and cannot be founded upon doubtful, vague, uncertain, and inconclusive evidence. 37 Am. Jur. 2d, Fraud and Deceit, sec. 468. The law of Pennsylvania is that the burden of proving fraud must be discharged by evidence that is "clear, precise and indubitable." *Aliquippa Nat. Bank* v. *Harvey*, 340 Pa. 223, 16 A. 2d 409, 412 (1940) ; *Gerfin* v. *Colonial Smelting & Refining Co.*, 374 Pa. 66, 97 A. 2d 71, 74 (1953). The Court of Appeals recognizes this rule as the law of Pennsylvania in fraud cases. *Kaufman* v. *Mellon National Bank & Trust Co.*, 366 F. 2d 326, 330 (C.A. 3, 1966) ; *Ratay* v. *Lincoln National Life Insurance Co.*, 378 F. 2d 209, 212 (C.A. 3, 1967). We think the Court of Appeals intended that the "clear, precise and indubitable" evidentiary rule, construed as the common law by Pennvania jurisprudence, should be applied in these cases. Such rule constitutes the "heavy burden" mentioned by that court.

There is no problem here relating to conflicts of law. The contracts were entered into in Pennsylvania. Thrift and Butler Loan were both Pennsylvania corporations with their principal places of business in that State. All of the petitioners resided in Pennsylvania. There were no other *contacts* outside of Pennsylvania. Any action between the parties would lie in a Pennsylvania court. Therefore, the law of Pennsylvania controls. Cf. *Griffith* v. *United Air Lines, Inc.*, 416 Pa. 1, 203 A. 2d 796 (1964).

Substantively, the law in Pennsylvania is clear as to what constitutes fraud necessary to render a contract voidable. It is succinctly stated

in *De Joseph* v. *Zambelli*, 392 Pa. 24, 139 A. 2d 644, 647 (1958), as follows:

> Where a party is induced to enter into a transaction with another by means of the latter's fraud or material misrepresentation, such a transaction can be avoided by the innocent party. Fraud arises where the misrepresentation is knowingly false, where there is a concealment calculated to deceive, or where there is a non-privileged failure to disclose. Fraud renders a transaction voidable even where the misrepresentation is not material; on the other hand, a misrepresentation made innocently is not actionable unless it is material, and in such case there must be a right to reliance. A misrepresentation is material when it is of such a character, that if it had not been made the transaction would not have been entered into. See Restatement on Contracts, 470, 471, 476.

In *A. P. Landis, Inc.* v. *Mellinger*, 116 Pa. Super., 167, 175 Atl. 745, 746 (1934), following the Restatement on Contracts, the court said:

> Restatement of the Law on Contracts, § 470, which defines "misrepresentation" as: "(1) Any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts. (2) Where a misrepresentation would be likely to affect the conduct of a reasonable man with reference to a transaction with another person, the misrepresentation is material, except as this definition is qualified by the rules stated in § 474." Section 474 provides: "A manifestation that the person making has no reason to expect to be understood as more than an expression of his opinion, though made also with the intent or expectation stated in § 471, is not fraud or a material misrepresentation, unless made by (a) one who has, or purports to have expert knowledge of the matter." A comment under this last-quoted section is, inter alia, as follows: "A frequent application of the rule stated in the Section occurs where there is a misstatement of law. A representation of a rule of law unless made by one supposed to have expert knowledge of the special rule to one who is ignorant of the subject, is inoperative. Except under such circumstances, the truth or falsehood of misrepresentations of law should not be relied upon."

The first element of fraud, i.e., a material misrepresentation, is not present herein. We are convinced on this record that no fraudulent misrepresentation was made by any person on behalf of Thrift.

Petitioners have not shown that Thift concealed, misrepresented, or failed to disclose any material information with respect to the Butler Loan-Thrift transaction. Hickox, acting on behalf of Thrift, gave notice in the offer letter written on November 2, 1959, and opened at the Butler Loan meeting on November 3, 1959, that agreements not to compete were part of the offer. Petitioners recognized this fact, as set forth in the minutes of the November 3, 1959, meeting of Butler Loan shareholders and directors. Further notice of the requirement of Thrift that agreements not to compete were to be executed, as well as the fact that consideration would be attributed or allocated thereto, was evidenced by the agreement forms which were sent by letter dated November 5, 1959, from Hickox to McLennan. McLennan gave the agreements to Phillips, and he put them away in his files without Thrift's knowledge.

Phillips, attorney for petitioners at the closing, knew that it was normal for agreements not to compete to be given in transactions such as those involved herein. He also knew and expected that amounts of consideration would necessarily be assigned to such agreements not to compete. The exact amounts to be assigned or attributed to each of the agreements were not known to either petitioners or Thrift because of the outstanding controversy between petitioners and Shukis. After the letters and agreements were sent to petitioners, Hickox assumed that the remaining details of the transaction rested in the hands of counsel for the parties. He did not know what McLennan had done with the agreements, but presumed that they had been distributed to petitioners. He knew that the attorneys for the parties had been in contact with one another concerning the transaction and that Thrift's attorney had all of the information concerning the details of the transaction from Thrift's standpoint, without any limitation upon disclosure to petitioners' attorney. Thus, all of the pertinent information, to the extent that it was available due to the uncertainty concerning the Shukis controversy, was either in the hands of petitioners or their counsel, or counsel for Thrift to whom Hickox had turned over the matter and with whom Phillips had been in contact.

Such actions do not indicate the existence of any plan or conspiracy on the part of Thrift to deceive petitioners. On the contrary, they affirmatively show that there was neither a plan to deceive petitioners nor any intent to suppress relevant information prior to the closing. It is also plain that Thrift did not contribute in any manner during the 2 weeks from the date of the offer until the closing date to petitioners' failure to investigate the tax consequences of the transaction.

Although Hickox knew the tax consequences to Thrift of paying amortizable noncompete consideration, it was not as clear in his mind what the tax consequences to the recipients would be. At best, he had a businessman's general knowledge of taxation, and not a comprehensive, specialized knowledge, as petitioners infer. Hickox did not profess to render tax advice, nor did he undertake to do so. As we see it, the substance of Hickox's statement to petitioners at the closing reflects that he laid his cards on the table when he told them (1) that Thrift was not representing that noncompete consideration qualifies for capital gains treatment, (2) that Thrift was going to amortize the noncompete consideration, and (3) that he "suspected" sellers in the past had reported noncompete consideration as capital gains. The first portion of the statement alerted or should have alerted petitioners that Thrift was not holding out to them that they were getting capital gains. The second portion of the statement advised them exactly of Thrift's intention concerning its own treatment of the noncompete consideration. The third portion of the statement was linked

to the other two as explanatory matter and expressly emanated from suspicion rather than what was considered to be reliable information.

This statement neither represented nor inferred that the Internal Revenue Service or the courts were allowing capital gains treatment to recipients of noncompete consideration. Certainly there is no evidence that Hickox "knew all the angles" and fraudulently led a group of unwilling persons into a tax trap. It cannot be seriously argued that he was misleading in any testimony given at the first trial. We did not conclude that petitioners had been defrauded on the record then made. Moreover, the Court of Appeals specifically stated in its opinion (378 F. 2d at 774) that—

after Thrift first evidenced its intention to make an allocation to the covenants not to compete the taxpayers had almost two weeks in which to investigate the tax consequences. Nevertheless, they entered into the agreement on the advice of their own counsel. The present record does not reveal that the taxpayers lacked a full understanding of the terms of the agreement or that the purchaser engaged in fraud, duress, or undue influence. We do not understand either the Tax Court or the dissent to view the facts any differently.

Now, after the hearing on remand, our conclusion is no different. Moreover, Hickox did not, by deception or concealment, deprive petitioners of their free will in signing the noncompete agreements. Even if he did tell petitioners that consideration allocated to the noncompete agreements might qualify for capital gains treatment or that petitioners would gain an "advantage" or would "benefit" from the noncompete allocation, such statements were not fraudulent misrepresentations. Our opinion (44 T.C. 549) was that such consideration did qualify for capital gains treatment and the Court of Appeals (378 F. 2d at 778) recognized that the execution of the agreements not to compete resulted in substantial cash benefits to petitioners.

The second element of fraud, i.e., detrimental reliance by petitioners on Hickox's statements, is also not present. Petitioners acted in accordance with the advice of their own counsel, Phillips, that they "go ahead and sign" the agreements. Phillips acted as their counsel at the closing. Thrift understood that petitioners were represented by Phillips. He stayed with petitioners until the papers were signed and the closing was over. He worked with McCaffrey in making the computations and with Rowland in petitioners' presence when the agreements were completed. Petitioners testified that Phillips represented them at the closing. The conclusion of this Court and the Courts of Appeals for the Third Circuit that petitioners were represented by counsel and relied upon his advice at the closing remains an irrefutable fact. In short, as between Phillips, the attorney for petitioners, and Hickox, Thrift's representative who was an adverse party and not an attorney, it is clear that petitioners relied upon the advice of their attorney when they signed the agreements.

Even if, from the conduct or words used by Hickox, there was a misrepresentation, we think there would still be no actionable fraud within the meaning of the rule enunciated by the Court of Appeals. We would still be required to sustain respondent because the petitioners had no right to rely upon any such "misrepresentation" made by Hickox. The controlling rule of law is contained in Restatement, Contracts, sec. 474,[3] which has been expressly stated to be the law of Pennsylvania in *De Joseph* v. *Zambelli, supra.*

Where there is a confidential relationship between the parties to a transaction, the utmost good faith must be exercised in their dealings. However, no such duty exists incident to the business relationship between the parties. *Elliott* v. *Clawson*, 416 Pa. 34, 204 A. 2d 272 (1964). Fraud cannot be established from statements of opinion as to legal matters, especially where made by one who, in his avowed capacity, is adversely interested. *Commercial Credit Corp.* v. *Sorgel*, 274 F. 2d 449 (C.A. 5, 1960) ; *Moore* v. *Steinman Hardware Co.*, 319 Pa. 430, 170 Atl. 565 (1935).

Hickox attended the closing on November 16, 1959, in his capacity as an officer of Thrift. Petitioners knew or should have known that he was attending the closing in the discharge of his duties in such capacity. He was a layman regarding legal matters. He neither had nor purported to have expert knowledge concerning the legal or tax consequences of agreements not to compete. The presence of Rowland, a reputable and responsible attorney representing Thrift, negates any inference or conclusion that Hickox fully knew the legal or tax consequences of the transaction that took place. Hickox had no duty to render any legal advice, nor were petitioners justified in relying upon any legal opinions that he may have made, especially when they had their own counsel present. In any event, the present state of the law as to the tax consequences of agreements not to compete is unclear. There are numerous, indeed conflicting, court decisions bearing upon the tax effects of such agreements. The instant cases serve as a prime example of the complexity in this area of Federal tax law.

An obviously weak link in petitioners' case is that there is simply no rule of law that one party to a transaction must foretell or predict

---

[3] Sec. 474, Restatement, Contracts, provides :

"MANIFESTATION OF OPINION AS FRAUD OR MISREPRESENTATION.

"A manifestation that the person making has no reason to expect to be understood as more than an expression of his opinion, though made also with the intent or expectation made in § 471 is not fraud or a material misrepresentation, unless made by

"(a) one who has or purports to have expert knowledge of the matter, or

"(b) one whose manifestation is an intentional misrepresentation and varies so far from the truth that no reasonable man in his position could have such an opinion. * * *"

Comment d to sec. 474 reads as follows :

"A frequent application of the rule stated in the section occurs where there is a misstatement of law. A representation of a rule of law unless made by one who is a lawyer to a layman, or by a person who may be supposed to have expert knowledge of the special rule to one who is ignorant of the subject, is inoperative. Except under such circumstances, the truth or falsehood of representations of law should not be relied upon. * * *"

the legal or tax consequences of the act to the other party to the transaction. The duty to do so rests upon the attorneys for the respective parties. The attorney is the proper person to whom each party should logically turn for advice and upon whom each may place justifiable reliance.

Accordingly, in our judgment the petitioners have failed to carry their "heavy burden" of proving by clear, precise, and indubitable evidence that they were fraudulently induced by Thrift to sign the agreements not to compete. We found as a fact in our prior opinion (44 T.C. at 555) that the testimony concerning what occurred at the closing of the transaction proved that—

Thrift officials did not tell the petitioners that they would receive capital gains treatment on the amounts allocated to the covenants, and Thrift also made no attempt to explain to the petitioners that these amounts would be taxable to them as ordinary income.

And the Courts of Appeals, in reviewing the record, commented that the "examination of all the evidence adduced in this case reveals nothing to demonstrate that the contract as written was not the taxpayers' conscious agreement." The evidence presented by the petitioners at the further trial on January 16, 1968, has not changed the basic facts. It is true that both parties produced evidence in greater depth as to what happened at the Thrift offices on the afternoon of November 16, 1959. But even with this additional evidence the petitioners are in no better position. Our original finding remains unaltered. Petitioners have not established to our satisfaction that they were defrauded by the conduct of, or statements made by, Thrift's representatives. There is no evidence of a "scheme" or "plan," express or implied, that Hickox or other Thrift officials conspired to hoodwink the petitioners. A studied review of all the testimony persuades us that fraud has not been proved. Thus the petitioners have not successfully challenged the tax consequences of their agreements as determined by the respondent.

Finally, we turn our attention to the situation involving Helen P. Sherman. Respondent contends, and we agree, that Helen Sherman executed an agreement not to compete. Rowland testified that he was under the impression at the conclusion of the closing that Thrift had all of the necessary documents. Helen Sherman testified that she did all that she was requested to do at the closing, that she signed everything presented, and that she did not refuse her signature. She also testified that she saw the agreements at the closing. She has not denied signing an agreement not to compete. To the contrary, her testimony leads to the conclusion that she did sign such an agreement. Thrift's check and attached voucher support this conclusion. She kept the full amount ($27,485.76) received from Thrift for her noncompetition agreement, an action consistent with assent to the terms of the transaction. Therefore, we hold that Helen Sherman signed an agreement

not to compete. Since the agreement is lost or unavailable, the testimony of the witnesses and other documentary evidence are sufficient to establish the terms of the agreement by secondary evidence.

In order to comply with the opinion and mandate of the U.S. Court of Appeals for the Third Circuit and to reflect the conclusions reached herein,

*Decisions will be entered for the respondent.*